**NORSUL OIL & MINING COMPANY, LTD., Plaintiff,**

v.

**TEXACO, INC., Texaco Petroleum Company, Gulf Oil Corporation, and Ecuadorian Gulf Oil Corporation, Ecuadorian Gulf Oil Corporation, Defendants.**

**No. 76–1629–CIV.**

United States District Court, S.D. Florida.

Dec. 15, 1988.

Claude H. Tison, Jr., MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff.

Kelley, Drye & Warren including Smathers & Thompson, Miami, Fla., Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

Lawrence R. Jerz, White Plains, N.Y., for defendants Texaco Inc. and Texaco Petroleum Co.

## MEMORANDUM OPINION

HOEVELER, District Judge.

THIS CAUSE came before the Court for trial without a jury on January 19, 1988. The trial was concluded on February 19, 1988. After consideration of the evidence and arguments the Court on February 29, 1988 orally announced in some detail its findings and conclusions to counsel for the parties. Counsel were each asked to submit proposed findings and conclusions in accordance with the Court's announcement.

They did so and the Court has considered the submissions in fashioning these, the Court's, findings of fact and conclusions of law.

This is an action for breach of contract, breach of fiduciary duty, and unjust enrichment. The claims arise out of a series of transactions for the exploration and exploitation of oil in the Republic of Ecuador, the most important of which for purposes of the present case was a 1965 agreement between the parties. Under that agreement, the defendants took over the plaintiff's right to explore and exploit for oil in a concession area in Ecuador in consideration for which the defendants paid $100,000 and agreed to pay the plaintiff and another company royalties amounting to two percent of the oil actually produced in the concession area. (the "overriding royalty").

The court has previously determined some of the trial issues in this case; *see Norsul Oil and Mining Company, Ltd., v. Texaco Inc.*, 641 F.Supp. 1502 (S.D.Fla. 1986).

As more fully set forth hereafter, the court now concludes that the plaintiff is entitled to recovery on two of its claims, namely breach of contract with respect to certain payments of royalties during 1973–1974, and for failure of the defendants to pay royalties on the oil produced at the well known as Shushufindi # 1, from 1976 to the present. Plaintiffs are not entitled to recovery on their claims for breach of fiduciary duty or unjust enrichment.

## GENERAL BACKGROUND

### The Parties

Plaintiff Norsul is a Canadian corporation organized and existing under the laws of the Province of Alberta. Its principal office is in Albany, Georgia. Wayne Fowler is the President of Norsul.

Defendant Texaco Inc. ("Texaco") is a corporation organized and existing under the laws of the State of Delaware. Defendant Texaco Petroleum Company ("Texaco Petroleum") is a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in the Republic of Ecuador. Texaco Petroleum is in the business of exploring for and producing crude oil in Ecuador. It is a wholly-owned subsidiary of Texaco. Robert Shields was the CEO of Texaco Petroleum from September 1971 to June 1977, and, at the same time the Vice President in charge of Latin American operations for Texaco Inc. He was also during this time the CEO for five other Latin American Texaco subsidiaries, based in six separate countries. (Tr. 1927–28, 1945, 2201–02.)

Compania Texaco de Petroleos del Ecuador, C.A. ("Texaco del Ecuador") is a corporation formed under the laws of the Republic of Ecuador and is a subsidiary of Texaco Petroleum. (Schwind Testimony, Tr. 3012; PTX 379). Compania Petrolera Pastaza, C.A. ("Pastaza") was a corporation formed under the laws of the Republic of Ecuador and was a subsidiary of Texaco Petroleum. It was dissolved on December 11, 1978. (Shields Testimony, Tr. 1952–53; PTX 379 at doc. no. 700903.)

Until 1983, when it was acquired by Chevron Corporation, defendant Gulf Oil Corporation ("Gulf") was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

Defendant Ecuadorian Gulf Oil Company ("Ecuadorian Gulf") is a corporation organized and existing under the laws of the State of Delaware. (O'Brien Testimony, Tr. 2321; PTX 379). Until December 31, 1976, it was in the business of exploring for and producing crude oil in Ecuador. (Shields Testimony, Tr. 1954; PTX 379). It is a subsidiary of Gulf. Terrence Andrew O'Brien was the CEO of Ecuadorian Gulf from December, 1975 to mid–1978. During this period, he reported to Thomas Lumpkin, who was the Vice President of Gulf Oil Latin America. (O'Brien Testimony, Tr. 2316–19; Schwind Testimony, Tr. 3012; PTX 379.)

Gulf Ecuatoriana de Petroleo, S.A. ("Gulf Ecuatoriana") and Compania Petrolera Aguarico, S.A. ("Aguarico") are corporations formed under the laws of the Republic of Ecuador and are subsidiaries of Ecuadorian Gulf. (Shields Testimony, Tr. 1952–53; PTX 379).

## NON–PARTY PARTICIPANTS

Phoenix Canada Oil Company, Limited ("Phoenix") is a Canadian corporation organized and existing under the laws of the Province of Ontario. Its principal office is in Toronto, Ontario, Canada. (Moore Testimony, Tr. 138.) Donald Moore is the president, director and the major shareholder of Phoenix. (Moore Testimony, Tr. 138, 324–25.) As more fully described below, Phoenix was an equal partner with Norsul in the royalty agreement relating to the Coca Concession. Phoenix was the plaintiff in a separate action, filed and heard in the United States District Court, District of Delaware. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F.Supp. 1061 (D.Del. 1987). Many of Phoenix' claims in that action were similar to those brought by Norsul here.

Minas y Petroleos del Ecuador, S.A. ("Minas") was a corporation organized under the laws of Ecuador. In 1961 Minas was a wholly-owned subsidiary of Norsul. (Moore Testimony, Tr. 148.) During the period beginning in 1961 and extending through 1971, Howard Steven Strouth ("Strouth") was Managing Director, principal operating officer, and major shareholder of Norsul. (DTX 138 at doc. no. 600742; PTX 19 at 1; Moore Testimony, Tr. 147, 339.)

CEPE is the acronym of the Ecuadorian State Petroleum Corporation. Through CEPE, the Government of Ecuador imposed itself into and participated in various petroleum-related commercial ventures.

### Events Leading Up to the 1965 Contract

#### The 1961 Concession

In July 1961, the Government of the Republic of Ecuador granted a concession to Minas to explore for and exploit petroleum reserves in approximately 4,350,000 hectares (approximately 10,744,500 acres) in the provinces of Napo, Pastaza and Morona Santiago in the eastern or Oriente region of

the Republic of Ecuador (the "1961 Concession"). (PTX 379 at doc. no 700904–05.) The 1961 Concession was granted pursuant to Government Decree No. 1401, (DTX 3B), which sets out each of the terms and conditions of the concession.

The 1961 Concession Contract required Minas to invest specified amounts of money each year in carrying out exploration and exploitation activities, to pay annual surface taxes and other fees and to monument (i.e., survey the boundaries of) the Concession Area. The annual expenditure requirements were to cease when the concessionnaire began continuous commercial oil production, with transportation of the oil to an Ecuadorian port. (DTX 3B.)

Minas did not have the capital to finance an oil exploration operation in the jungle region of eastern Ecuador. It also did not have the capital or expertise to build an infrastructure to exploit the oil, including a pipeline to transport oil to the Pacific coast. (PTX 24 (attachment) at 2; PTX 4; Moore Testimony, Tr. 342.)

At one point, in 1963, Strouth of Minas approached Moore of Phoenix to ask for help in paying for Minas' surface taxes to the Government for its concession in Coca. Phoenix at that point paid the surface tax in return for 30% of Minas' capital stock. (Tr. 149–150.) As a result of further investment to assist in exploration, Phoenix acquired 60% of Minas' capital stock. (Tr. 150.)

In early 1965 Strouth approached affiliates of the defendant companies with the proposal that they acquire part of the 1961 Concession. (PTX 19 at 1.) Phoenix and Norsul (Minas) simply did not have the capital to properly explore the area and move the oil, if found.

### THE 1965 CONTRACT

On July 16, 1965, Minas, Texaco del Ecuador and Gulf Ecuatoriana executed a contract (PTX 26) in Quito, Ecuador (the "1965 Contract"). In the 1965 Contract

Minas agreed, subject to obtaining the Government's approval, to transfer to Texaco del Ecuador and Gulf Ecuatoriana, or their designees, Minas' interests under the 1961 Concession Contract in a specified portion of the area covered by the concession, which became known as the Transfer Zone or the Coca Concession. (Schwind Testimony, Tr. 2846, 2848, 3015, 3016–17; PTX 26, Cl. 3.)

The Coca Concession was located in the Oriente, or eastern, region of Ecuador, a sparsely populated area mostly covered by thick jungle. The Concession area shared its northern border with a second concession area, known as Napo, upon which the defendant companies had had a grant from the Government of Ecuador to explore and exploit for oil. They had obtained NAPO in 1964.

In the 1965 contract, Minas agreed to execute a transfer deed to the concessionaires (the Texaco and Gulf subsidiaries) conveying the coca concession to Texaco del Ecuador and Gulf Ecuatoriana or their designees. The transfer was conditioned upon government approval of the transfer. The terms of the expected contract of conveyance were drafted and agreed upon when the 1965 Contract was executed, and the form of contract of conveyance was attached to the 1965 Contract as Annex No. 1. (Schwind Testimony, Tr. 693; PTX 26, Annex No. 1.) The 1965 Contract provides that the terms of Annex No. 1 were "accepted by the parties to the 1965 Contract." (PTX 26, Cl. 3(a); Schwind Testimony, Tr. 2846, 2917, 2935, 3012–13.)

Texaco del Ecuador and Gulf Ecuatoriana agreed to pay Minas $15,000 in cash on the signing of the 1965 Contract; $85,000 in cash if the Government approved the transfer; and royalties in the form of cash payments equal to 2% of the value of oil production that Texaco del Ecuador and Gulf Ecuatoriana obtained from the Coca Concession and sold or delivered (the "royalties").[1] (Schwind Testimony, Tr. 2858, 2921–22; PTX 26, Cl. 4, Cl. 5, Cl. 6.)

---

1. At trial, considerable argument was offered concerning the use of the term "royalty" to signify the payment by defendants of the two

percent of net production defined by the 1965 Contract. According to the defendants, the term royalty (Spanish *regalia*) siginifies an in-

### The 1966 Conveyance

Pursuant to Clause 15 of the 1965 Contract, Texaco del Ecuador and Gulf Ecuatoriana designated two Ecuadorian companies, Pastaza and Aguarico, which were formed for the purposes of the transfer, to be the transferees. (DTX 13B at 1; Schwind Testimony, Tr. 2922.) On December 20, 1965, the Government of Ecuador granted its approval of the transfer to Pastaza and Aguarico. (PTX 29; Moscoso Testimony, Tr. 849; Schwind Testimony, Tr. 3015.) A contract of conveyance (DTX 13B) was executed by representatives of Minas, Pastaza and Aguarico on February 23, 1966 (The "Transfer Agreement"). (DTX 13B; Schwind Testimony, Tr. 3022.)

The terms of the Transfer Agreement are identical in all material respects to the terms of Annex No. 1 to the 1965 Contract. (Schwind Testimony, Tr. 2937–38, 2917, 29835, 2846). The Transfer Agreement provides, *inter alia,* that the companies can exploit the concession "at their discretion." (DTX 13B, Cl. 7(b); Schwind Testimony, Tr. 2937.) The companies are permitted to:

abandon the transfer zone or return it to the Government in part, on one or several occasions, or totally, without need to obtain the permission or consent of the transferor. (DTX 13B, Cl. 7(c).)

Further, the parties expressly agreed that the oil companies would not be Minas' partners or its agents. Clause Fifth provides:

"The parties expressly state that this deed does not imply partnership nor joint accounts; nor imposes upon any of them the obligations that the partners of an association or company may have between them; nor confers to any of the parties the capacity of agent, servant, or employee of the other." (DTX 13B, cl. 5.)

Minas transferred to the oil companies all of its rights to explore for and exploit oil under the 1961 Concession Contract. (Moscoso Testimony, Tr. 695–96; Schwind Testimony, Tr. 3017–20, 3037.) The Instrument of Conveyance explicitly provides:

[T]ransferor states, also expressly, that together with the transfer zone, it also transfers to the cessionaries, as related to the transfer zone, *all and each one of the rights granted to the transferor by the Government, according to the contract, and all other rights derived from the same contract,* although not specifically mentioned therein, and in addition, *all the rights that transferor may have in accordance with the Petroleum Law and the Mining Law in effect.* Accordingly, from the day of the inscription, cessionaries shall succeed transferor in *all of its rights,* as they may refer to the transfer zone." (DTX 13B, Cl. 7(a); (emphasis added.)

### THE DEVELOPMENT OF THE COCA CONCESSIONS

During the period from 1964 through 1972, Texaco Petroleum and Ecuadorian Gulf undertook extensive exploration activities in the Coca and Napo concession areas, and, beginning in 1967, made a series of Wildcat discoveries. The companies invested considerable sums of money to carry out the exploration activities and to build the infrastructure needed to exploit the crude oil, including constructing the Trans–Ecuadorian Pipeline System (the "pipeline"). (Shields Testimony, Tr. 1951.) By 1972, when production began, the companies' investment assets exceeded $240 million (PTX 379 at doc. no. 700924–25; Shields Testimony, Tr. 1970, 1990). By 1976 they had invested more than $350 million. (PTX 332 at 1; PTX 379 at doc. no. 700924–25.)

### SHUSHUFINDI WELL NUMBER 1

In 1969, a dispute arose between Norsul and the companies regarding the position

terest in land, and the two percent payments here were only a contractual interest. Furthermore, the Spanish term *regalia* connotes a sovereign right that only the state can hold. For this reason, the Ecuadorian Government was, for a time, very hostile to the royalty payments to Norsul, which the Government viewed as a usurpation of a governmental power. This court does not share the Government's concern, and will use the term royalty throughout to signify the contractual obligation to make two percent payments on oil produced and sold from the Coca Concession.

of a well known as Shushufindi number 1 ("Shushufindi"). Shushufindi was the most productive well in the concession area. As indicated previously, the companies had concession rights in the area north of Coca known as Napo, acquired prior to the acquisition of rights in the Coca Concession. One of the principal issues presented relates to the positioning of this well, and therefore the rights to royalties on the oil from this most fruitful source. If in Coca, it was subject to Norsul's royalty payments. Norsul advised its shareholders on January 20, 1969 that Shushufindi was in the Coca Concession. (DTX 412.) Thereafter, the SEC initiated an investigation which ultimately led to litigation between the parties in New York.

Norsul filed suit in the United States District Court for the Southern District of New York, case no. 69 civ. 5562. The Complaint sought, *inter alia,* a declaratory judgment as to the location of Shushufindi. (PTX 66.)

On May 5, 1970, the parties to that lawsuit signed a stipulation for dismissal. That stipulation (between Norsul and the parent corporations) stated, in pertinent part:

> "Defendants Texaco Inc. and Gulf Oil Corporation shall and hereby do acknowledge that the well known as Shushufindi No. 1 is presently located within the area which is commonly known as the "Coca Concession" and that by reason of the above, Minas y Petroleos del Ecuador, S.A., its successors and assigns, are entitled to two percent of the net production of said well as defined in their private contract dated July 16, 1965...." (PTX 69.)

Because of the agreement (stipulation) the action in the New York District Court was dismissed. The question concerning the location of the well was resolved. This disposition was honored by the parties until March 16, 1976, when, because of a government survey, the companies took the position that they were no longer obligated. Norsul was informed that no royalties would be paid on Shushufindi oil after January 1, 1976, and none have been since that date.

Before entering into the stipulation in the New York action, Texaco and Gulf had run surveys which located Shushufindi south of the concession boundary. In the fall of 1969, surveys showed #1 south of the NAPO line but by a different distance than the astronomical line shown. Texaco/Gulf then ran a definitive survey to be assured of the findings (Feb.1970). See PTX 67–B. That survey showed Shushufindi Well #1 to be 150 meters south of the NAPO line. Thereafter the New York litigation was concluded.

According to a later survey, apparently done at the urging of defendants or one of them, Shushufindi is located at latitude $0°10'12.6185''$ South, which is north of the boundary between Coca and Napo, and therefore in Napo. (PTX 323.) The survey was a "trigonometric" (i.e. astronomic) survey, which according to testimony is a less accurate surveying method than a "geometric" survey. (Tr. 3250–51.) The court makes no specific finding as to the relative merits of various surveying methods, as there was no proper expert testimony offered on the subject. The survey itself, however, on its face purports to have been undertaken pursuant to duties to monument the concession areas arising out of the 1973 Exploitation Contract. (DTX 124B.) The actual survey appears to be a single, isolated determination of the location of the Shushufindi well, not an attempt to monument boundaries. Thus, the court does not find that the survey, upon which the companies relied in their refusal to continue paying royalties on the well, was sufficient to warrant that refusal. This finding is further supported by the prior stipulation of settlement entered by the parent corporations locating Shushufindi south of the Coca/Napo line. Finally, a prior astronomical survey had located Shushufindi at a point south of the 1976 finding, and south of the boundary. (PTX 65.)

As indicated, defendants ceased paying any royalties after January 1, 1976, because of the later survey of Shushufindi #1 by the Institute for Military Geography

(I.G.M.). This survey was apparently inspired by Defendants, purportedly in compliance with the 1973 exploitation contract required by Ecuador. However, the history of the location of well # 1, as partially developed above is important. The boundaries of the Coca Concession (1961) and NAPO (1964) overlapped. The boundary in the Coca agreement and the 1965 contract was well north of the same boundary described in the NAPO concession agreement. In 1969, when renegotiated contracts were entered into for both NAPO and Coca the issue was resolved by moving the line northward. Ultimately, the Federal Court action resulted involving the parent Texaco/Gulf companies and the issue of location finally resolved. The relevant agreements and litigation are binding upon the parties to this litigation. Subsequent surveys, questionable or otherwise, however inspired, with which plaintiff had no participation will not be considered by the Court as affecting the earlier position of the parties. Neither does the Court consider as controlling or compelling a change in the royalty position of defendants as a result of the later survey. The companies did bring a successful action in an Ecuadorian court (the Fiscal Tribunal), which held that royalties previously paid on Shushufindi could be recovered by the companies. (DTX 409 B, p. 3). That result does not bind the parties to this action.

The conduct of defendants in their dealings with Plaintiff and Phoenix, as will be at least partially described, left much to be desired. It is in this setting, that the later events relating to Shushufindi # 1 should be considered and in this setting that the court has, in relating relevant facts, been guided to findings on this issue.

## PHOENIX INTEREST IN THE ROYALTY PAYMENTS AND "THE MINAS THING"

To understand Phoenix' interest in the royalty payments, it is necessary to review early developments. During the time period after Minas' acquisition of the concession (1961) and before the beginning of production in the concession areas in 1972, there were two main actors from the plaintiff's side of the transactions: Howard Strouth and a consortium of oil companies headed by Amarada Hess, a major international oil company.

Strouth was Norsul's president during the acquisition of the original concessions, the investment by Phoenix, the negotiation of the 1965 contract, and the Shushufindi New York litigation. During the 1960s, Strouth resided in Ecuador. He was a colorful man, given to flamboyant dress and language, and he made some enemies in the Government of Ecuador. In the late 1960s, Norsul was reorganized, and Strouth's only subsequent connection with it was as a shareholder. The animosity some Ecuadorians felt toward Strouth caused problems for Norsul later, and Norsul expended considerable efforts to convince the representatives of the Ecuadorian Government that Norsul was distinct from Strouth Amarada Hess, and a Houston group known as World Ventures which had acquired a small and unrelated percentage of the original Coca concession.

After entering into the 1965 Contract transferring Coca to the companies, Minas (whose main shareholders were Norsul and Phoenix) entered into the agreement to transfer out the remainder of the original concession to the consortium headed by Amarada Hess. To keep the Coca royalty separate, another Norsul/Phoenix subsidiary, Petromin, was formed to hold the royalty and the Norsul/Phoenix equity in Minas was reduced to 15%. Subsequent assignments through Petromin have resulted in the present arrangement under which Norsul and Phoenix each hold a 50% interest in the 2% royalty (i.e., each gets 1%). Phoenix had acquired its interest in the concession as a result of its investment of funds to help finance exploration.

The Amarada Hess consortium explored until after the enactment of the 1971 Hydrocarbons Law, which increased surface taxes and required renegotiation of existing contracts. When they refused to pay the new surface taxes or to renegotiate the contract, the Government declared caducity, taking over the concession. Soon after-

ward there was a movement in the Government to attach Norsul's royalty for payment of the unpaid surface taxes. Norsul was able to demonstrate its independence from the consortium and to persuade the Government not to take such action. (*See* Tr. 186–89; 203–05; 1271–93.)

Plaintiff offered proof at trial that the defendant companies used "the Minas thing", i.e. the local hostility toward Minas engendered by the aberrant behavior of Strouth and the consortium, to prejudice Norsul's interest in royalty payments.

### The 1971 Hydrocarbons Law

On September 27, 1971, the Government of Ecuador enacted a new hydrocarbons law (the "1971 Hydrocarbons Law"), replacing the prior 1937 Hydrocarbons Law. The new law, similar to the 1937 law, set out the basic concept that the Government of Ecuador perpetually owned all petroleum resources in Ecuador. It provides:

> "The deposits of hydrocarbons and accompanying substances, in whatever physical state, located in the national territory including the areas covered by territorial sea water, belong to the inalienable and imprescriptible patrimony of the State." (DTX 40B, Ch. 1, Cl. 1.)

The 1971 Hydrocarbons Law mandated that concession contracts granted by the Government provide for Government participation in the production; a maximum participation area considerably smaller than allowed by the prior law; a tax reference value ("TRV") unilaterally established by the Government to calculate royalties payable to the Government; and higher Government royalties than allowed by the previous law. (DTX 40B.)

### THE ADVENT OF THE MILITARY GOVERNMENT

In February, 1972, a military Government seized power in Ecuador and ousted the elected civilian Government. (Shields Testimony, Tr. 1962, Fowler Testimony, Tr. 1642.)

The head of the new military Government, General Rodriguez Lara, appointed Navy Captain Gustavo Jarrin Ampudia to be the Minister of Natural Resources and Energy. (Jarrin Testimony, Tr. 2676). During the period he served as Minister, from February 1972 until October 1974 (Jarrin Testimony, Tr. 2676), Captain Jarrin established and implemented the Ecuadorian Government's oil policies. (Jarrin Testimony, Tr. 2697–98.) Dr. Luis Alberto Arauz was Captain Jarrin's legal advisor. (Arauz Testimony, Tr. 2552–57; Jarrin Testimony, Tr. 2680–81.)

Shortly after the military Government took power, it issued a series of resolutions and decrees which increased significantly the Government's control of, and participation in, oil-producing operations in Ecuador.

### Supreme Decree No. 430

On June 6, 1972, the military Government issued Supreme Decree No. 430.[2] (DTX 47B.) Decree 430 prescribed that the 1971 Hydrocarbons Law would be retroactively applied to all concession contracts entered into before the law had been issued. All concessionaires who had entered into contracts before the date of enactment of the 1971 Hydrocarbons Law were required to sign new contracts, within a year, consistent with the terms of the new law. (DTX 47B, Cl. Fifth, Cl. Sixth; Arauz Testimony, Tr. 2582–83; Jarrin Testimony, Tr. 2686–87; Shields Testimony, Tr. 1963; PTX 241 at 1–2.)

After Decree 430 was enacted the companies had the option of refusing to sign new contracts, and probably losing all or part of their investments, or signing the new agreement with the new limitations included.

The companies, as dictated by Supreme Decree No. 430, relinquished some acreage to the Government at the end of December 1972. (Shields Testimony, Tr. 1972; *accord* Arauz Testimony, Tr. 2589–91; Jarrin Testimony, Tr. 2691–92; DTX 75.) Soon after the acreage was returned to the Government, the government-owned oil

---

2. Under Ecuadorian law, a Supreme Decree has the same effect as a statute. (Tr. 736.)

company, CEPE, began exploiting it. (Shields Testimony, Tr. 1973–74.)

In January 1973 the companies requested compensation from the Government of Ecuador for the acreage they were required to relinquish. (Shields Testimony, Tr. 1978–79.) The Government rejected the companies' request for compensation. Minister Jarrin announced publicly that the Ministry

> declares in a definite and emphatic way that it does not accept nor shall [it] accept any request for indemnification because it is not covered by the legal provisions in force nor by the petroleum policy encouraged by the nationalistic and revolutionary Government of the Armed Forces." (DTX 75; Shields Testimony, Tr. 1981.)

## NEW OIL CONTRACTS

On March 27, 1973 the Government, in Decree No. 317, issued a Model Contract which prescribed the terms of the new contract with the Government that the companies would have to execute. (DTX 104B; Shields Testimony, Tr. 2000.) The Model Contract provided, *inter alia*, for: Government participation in the companies' oil producing operations (DTX 104B, Cl. 59); a net reduction of the Coca Concession exploitation period by 14 years (DTX 104B, Cl. 4); an open-ended requirement that the companies provide Ecuador's refineries and industrial plants with internal consumption crude (DTX 104B, Cl. 26.2, DTX 378); and increased Government royalties (DTX 104B, Cl. 36).

## THE 1973 EXPLOITATION CONTRACT

On August 4, 1973 the Government of Ecuador issued Decree No. 925 (DTX 124B), which decreed, *in haec verba*, all of the terms and conditions of the new exploitation contract (the "1973 Exploitation Contract") that Texaco Petroleum and Ecuadorian Gulf would be required to execute pursuant to Supreme Decree No. 430. The companies were faced with signing the 1973 Exploitation Contract, or giving up their Ecuadorian operations.

The 1973 Exploitation Contract described a consolidated area (the "1973 Contract Area") that consisted of the portions of the Coca and Napo Concessions which remained with the companies; and substituted a new set of contractual rights less favorable to the companies than the 1961 Concession Contract. The contract included many of the provisions unfavorable to the companies that the Model Contract required, including a fourteen year reduction in the exploitation period. Further, the 1973 Exploitation Contract set CEPE's participation percentage at 25% to begin in June 1977. The contract did not specify the consideration the Government would pay. (DTX 124B.) By participation, the parties meant that CEPE would begin to receive 25% of the net production of oil, as well as supply 25% of the costs of production.

The Government did not agree to pay the companies any compensation for the extinguishment of their right to extract oil during the period from 1992 through 2006, nor for CEPE's acquiring of a 25% participation. Minister Jarrin stated the reasons the Government would not compensate the companies:

> How was the Government going to pay any amount over the wealth of the subsoil which, according to the law, is inalienable and indescriptable (sic). It belongs to the State. It did not have to pay anything. It did not have to pay something that was its own property. (Jarrin Testimony, Tr. 2691.)

In 1973, the Republic of Ecuador became a member of the Organization of Petroleum Exporting Countries ("OPEC"). (DTX 143; Shields Testimony, Tr. 2014.) This supplied an additional reason for the Government not to pay for rights to exploit oil reserves, in that it was OPEC's policy that member countries would compensate foreign oil companies upon obtaining participations only for the "net book value of the assets" because "the petroleum reserves belong to the countries" and foreign oil companies holding oil concessions "did not have rights in the oil." (DTX 151; Shields Testimony, Tr. 1944, 1942.)

## THE GOVERNMENT'S 1974 TAKING OF A 25% INTEREST

### Supreme Decree No. 9

Although the 1973 Exploitation Contract provides that CEPE's participation would become effective no sooner than June 1977, the Government, in Supreme Decree 9, issued on January 2, 1974, mandated that CEPE would take its participation within the year 1974. By accelerating the effective date of CEPE's participation by more than three years, the Government extinguished, without paying compensation, the companies' contractual right to 25% of the production from the 1973 Contract Area for the period from 1974 through 1977. (DTX 149B; Arauz Testimony, Tr. 2596–97.)

The companies resolved to seek compensation for Government's acceleration of CEPE's participation. (Shields Testimony, Tr. 2018–19.) In meetings with the Government, the companies requested compensation for their unamortized assets at updated book or current value and compensation for the loss of their rights to 25% of crude oil produced from the 1973 Contract Area for the period from 1974 through 1977. (Shields Testimony, Tr. 2026; DTX 191.)

The Government representatives told the companies that they would be compensated only for their producing and pipeline assets, at net book value of the unrecovered actual cost of their investment in the producing and pipeline assets, rather than current or updated book value. (Arauz Testimony, Tr. 2600–03; DTX 191; DTX 192; DTX 242; Shields Testimony, Tr. 2026, 2029–2030.) The Government rejected outright the companies' request for compensation for their lost rights to 25% of the crude oil produced from the 1973 Contract Area for the period from 1974 through 1977. (Jarrin Testimony, Tr. 2696; *accord* Arauz Testimony, Tr. 2601.)

### The June 14, 1974 Acta

On June 14, 1974, the Minister of Natural Resources, the general manager of CEPE, and the Ecuadorian managers of Texaco Petroleum and Ecuadorian Gulf executed an "Acta" or minutes of an agreement (the "1974 Acta"). (DTX 201B.) The 1974 Acta provides that CEPE, as of June 6, 1974, would have a 25% interest in the companies' oil producing operations (Clause 3) and the pipeline (Clause 6), and would pay the companies for 25% of the investments on their books, less depreciation and amortization. (DTX 201B, Cl. 3, Cl. 6; Jarrin Testimony, Tr. 2740–41, 2706, 2742; Arauz Testimony, Tr. 2611, 2612–13, 2594, 2604–05; Shields Testimony, Tr. 2061; Schwind Testimony, Tr. 2891–93.) The 1974 Acta did not provide for any payment to the companies for any of Norsul's interest in future royalties. (*See* DTX 201B). In short, the Government was taking 25% of production as well as assets and it did not contemplate payment of any royalties to Norsul as provided for in the 1965 Contract between Norsul and the companies.

Clause 4 of the 1974 Acta provided for an audit of the books of Texaco Petroleum and Ecuadoria Gulf by an independent international accounting firm to verify that the assets to be paid for had been properly reported at actual cost, and that depreciation and amortization had been properly calculated. (DTX 201B; Arauz Testimony, Tr. 2609–10.) Despite the provision in the 1974 Acta that the Government would acquire and pay for 25% of the pipeline, the Government determined in 1975 that it would not acquire any interest in the pipeline and that the pipeline was to be excluded from the audit. (DTX 240B; Shields Testimony, Tr. 2070–71.)

CEPE selected the international accounting firm of Peat, Marwick, Mitchell & Co. ("PMM") to audit the producing assets on the companies' books as of June 6, 1974. On June 10, 1976, PMM completed its final audit report. (DTX 276 B.) PMM concluded, based on its audit, that, as of June 6, 1974, the net book value (cost less depreciation and amortization) of Texaco Petroleum's and Ecuadorian Gulf's producing assets and their materials and supplies inventory was approximately $182,000,000. (DTX 276B.) The Central Bank paid Texaco Petroleum and Ecuadorian Gulf $45,033,671 in connection with the 1974 transaction, which was, as indicated, 25% of the

book value, less depreciation and amortization, of Texaco Petroleum's and Ecuadorian Gulf's producing assets and materials and supplies as of June 6, 1974.

According to the Government, its payment of $45,033,671 in the 1974 transaction did not include any amount for the companies' lost rights to produce crude oil. (Jarrin Testimony, Tr. 2698, 2699–2700, 2702–03, 2741, 2743, 2773; Arauz Testimony, Tr. 2604–05, 2610, 2611–12, 2635–36, 2668, 2672–73; Shields Testimony, Tr. 2069.) Minister Jarrin, the Government official responsible for determining what the Government would pay for (Jarrin Testimony, Tr. 2697–98), testified that: "The Ecuadorian Government paid solely for nonamortized investment at book value." (Jarrin Testimony, Tr. 2698; *accord* 2702–03, · 2712, 2773.) "[We paid] for nonamortized investments [and] no additional right." (Jarrin Testimony, Tr. 2741; *accord* 2699–2700.) "I repeat once again. The Government ... had no reason to purchase rights. It did not buy any rights." (Jarrin Testimony, Tr. 2742.) On the other hand, plaintiff's expert, Mr. Gruy, testified that the assets necessary to produce oil have no value except to produce a cash flow in the production of oil. (Tr. 1061.) Thus, in Mr. Gruy's opinion, the payment for assets, even for book value, necessarily included a payment for the right to explore and exploit oil. The court will consider this opinion further in its Conclusions of Law, *infra.*

While the companies were experiencing difficulties due to the acquisidtory attitude of the Government, Minister Jarrin, in early 1973 made it clear that he was opposed to any contract which would provide payments to parties who were not, in fact, exploring for and exploiting and transporting the oil. The companies, by a series of manuveurs, had delayed paying royalties to Plaintiff. In February of 1973, Minister Jarrin recommended to the Finance Minister that the royalties provided for in the 1965 contract be confiscated by the Government and ordered that the companies not make any payments to Norsul and Phoenix. (TR. 2129–33; PTX 153A; PTX 159A; DTX 87B; DTX 377.) Minister Jarrin failed to persuade the Finance Minister to confiscate the royalties. (Tr. 2707–2710; 1697–98). However, the President of Ecuador did impose an 86% income tax on the royalties. Supreme Decree 602 (DTX 110B). (The prior corporate income tax in Ecuador had been 44.4%.) The decree was issued on May 29, 1973, and applied retroactively to cover all of the royalties. The decree required that the companies withold the tax and deposit it directly in the Central Bank of Ecuador, for the account of the National Development Bank (Banco de Fomento). Tr. 2713–15; 2616–17; 2147–48.

## UNDERPAYMENTS OF ROYALTIES

During the time that the companies were experiencing the above described difficulties with the Government, they took actions to change their position with regard to the royalty holders, Norsul and Phoenix. As the underpayment of royalties is one of the principal issues presented herein, and the time sequence corresponds to many of the above described events, the important factual details surrounding the underpayments will follow here.

Pursuant to the terms of the 1965 Contract, the first royalty payment was due in October, 1972. (Tr. 205.) The payment was not made at that time, and Norsul and Phoenix began efforts to obtain payment. Defendants asked for 30 days, then asked for additional delay. In January, 1973, a meeting between representatives of Norsul, Phoenix, Gulf, and Texaco, was held in Coral Gables, Florida. (Tr. 209.) The subject of the meeting was the royalty payments. The companies took the position at the meeting that Norsul and Phoenix would have to sign a new "Interim Agreement" concerning the price basis for the royalties. S. Donald Moore, President and Director of Phoenix objected to signing the Interim Agreement as unnecessary, since he was of the view the companies had a binding obligation under the 1965 Contract to pay the royalties. Clauses 6 and 7 of the 1967 contract address questions relating to the cash payment of the royalties. Clause 6 provides that the price of oil used in determining the royalty shall be "... understood as the value defined in each case for

the purpose of calculating the payment of royalties which cessionaires (Defendants) must make to the government...." Mr. Lucas for Gulf stated they (companies) wanted to establish the oil price and other parameters before payments were made. Some "little" problems relating to title were also mentioned. He ultimately demanded that plaintiff's representative sign the "interim agreement" or sue. It should be noted here that Fowler of Norsul never objected to the use of the tax reference price as required by defendant companies. Moore of Phoenix was eventually persuaded to sign an agreement on assurances from Mr. Kinsel of Texaco that signing the Interim Agreement would result in immediate payments of the royalties due. (Tr. 216–217.) The Interim Agreement was signed by the parties on February 5, 1973. (PTX 151.) Plaintiff took the position and the Court agrees; the "Interim" agreement was unnecessary. When Norsul and Phoenix did not receive payments for the royalties, on or about February 11, 1973, Moore and Wayne Fowler travelled to Coral Gables, Florida, where they were told by a representative of Texaco that the check would have to be issued from Quito, Ecuador. They then travelled to Quito where they met with Juan Quevedo, a representative of Texaco. At the meeting, when questioned about the checks, Mr. Quevedo produced two checks but said that they had to be released by Coral Gables. Mr. Quevedo did not give the checks to Moore and Fowler.

As indicated above, the reference price in the Interim Agreement coincided precisely with the government tax reference value. (PTX 151; Tr. 218–219.) The companies not only did not object to basing the royalties on the Government TRV but insisted upon that method. Payments were eventually made on that basis for five quarters. (Tr. 1296–97.) Subsequent to Defendants sending Plaintiffs representatives on a futile quest for the royalty checks and before any amounts were paid, the Ecuadorian government entered the scene with legislation and edicts which at first raised serious

questions as to whether the royalties would be permitted at all and then taxing the royalties significantly as previously described. It would not be amiss at this juncture to note that the succession of events in late 1972 and early 1973 raise serious questions as to both the good faith and even complicity of defendants (with the government) in the delay of payments and the later government action relating to the royalties.

The first royalties were paid late in 1973. As per agreement, the tax reference value was the basis for payments. At about that time, the world oil price rose dramatically. (Tr. 1300.) The United States placed a ceiling price on oil produced in the United States which caused it to remain substantially lower than the world price. The Ecuadorian oil price, and hence the Government's tax reference value, rose in this period along with world oil prices. In October, 1973, the companies in a reversal of position sought to renegotiate the royalty agreement with Norsul and Phoenix. (DTX 133; DTX 435; Tr. 2150.)

On January 18, 1974, Fowler met with Lucas of Gulf and Watkins of Texaco in Coral Gables.[3] At that time, taking the new position, Lucas told Fowler that the companies were of the opinion that the 1973 Exploitation Contract (DTX 124B, 126) between the companies and the Government and required by the Government extinguished the 1965 Contract, and thus the defendant companies were studying whether there was any continuing contractual obligation to pay any royalties to Norsul. One of the companies' representatives stated to Fowler that "there might be a moral obligation" to continue the royalties. (Tr. 1299.) There was also discussion at the meeting of renegotiating the price basis for the royalties, given the steep rise in the tax reference price. (Tr. 1733.)

On February 7, 1974, a meeting was held in Coral Gables between Fowler and other Norsul representatives and representatives of the companies. At the meeting, pressing their complete reversal of position, the companies took the position that the 1965

**3.** Both of these men were representatives of the parent corporations.

Contract was void because of the 1973 Exploitation Contract. They did not mention that their Quito counsel had advised them differently. The companies stated they would not make any further royalty payments unless Norsul agreed to a new contract. The new reference price that the companies advocated was an average of the Ecuadorian TRV and the "West Texas" crude price. This new reference price was said to be based on the 1961 Concession Agreement. A 10% reduction in reference volume was also pressed, since the Government of Ecuador had raised the Government royalty that the Companies were obligated to pay by 10%. At the close of the meeting, a tentative agreement to a new reference price along the lines of the companies' proposal was reached. Soon after the February meeting, Fowler received a draft of the proposed agreement not finalized at the meeting. (PTX 222, 388; Tr. 1412.) Fowler found that many of the terms included in the draft had not been discussed at the February meeting, and would not agree to it. Tr. 1413–1414.

Nevertheless, the companies made royalty payments for the fourth quarter of 1973 and the first two quarters of 1974 using a West Texas crude price as the basis, with a 10% reduction in volume. PTX 233, 235. Plaintiff now seeks the difference in royalty payments for the three quarters in question.

## THE 1977 TRANSACTION

### Adverse Actions by the Government Leading to the 1977 Transaction

In 1973, the Government decreed that the companies deposit with the Central Bank the greater of: (a) the actual proceeds of export sales of their crude oil production, or (b) their presumed proceeds of such sales, calculated by using the tax reference value. The deposits were referred to as "incautation deposits." (DTX 50B; O'Brien Testimony, Tr. 2582–84; PTX 379 at doc. no. 700914, 700934–35.)

The Central Bank applied the incautation deposits to satisfy the companies' obligations to the Government which, in the aggregate, were referred to as the "Host Government Take" or "HGT". (O'Brien Testimony, Tr. 2323–24; PTX 379 at doc. no. 70934–35.) After deducting the HGT, the Central Bank returned to the companies the remainder of the incautation deposits to cover their costs and profits. (O'Brien Testimony, Tr. 2382; PTX 379 at doc. no. 700934–35.) The HGT accounted for approximately 85% of the incautation deposits made by the companies. (O'Brien Testimony, Tr. 2323–24, 2382, 2385.)

The companies protested to the Government that the Central Bank habitually retained more of the companies' incautation deposits than was necessary to satisfy income taxes and other elements of HGT. (PTX 324 at doc. no. 03555–57; DTX 236 at 1–2; O'Brien Testimony, Tr. 2351–52; Shields Testimony, Tr. 2076.) By 1976, the companies argued that the Government had overretained approximately $22 million. (PTX 324 at doc. no. 03566 at 7–9; DTX 236 at 1.) Half of the $22 million was owed to Ecuadorian Gulf. (O'Brien Testimony, Tr. 2333, 2387–88; PTX 379 at doc. no. 700935.)

### Internal Consumption Crude Losses

In January 1973, the Government, by Decree No. 88, set the price that it would pay for internal consumption crude at 35 sucres or $1.48 per barrel. (PTX 379 at doc. no. 700916; Shields Testimony, Tr. 2003, 222–25, 2097–98, 2308, 2309; O'Brien Testimony, Tr. 2329–30.)

Beginning in May 1974, all internal consumption crude that the companies sold to CEPE was subject to the same HGT as crude sold by the companies to third parties as export sales. Thus, the Government royalties that the companies were required to pay on internal consumption crude were based upon the tax reference price set by the Government, even though the Government had fixed an artificially low purchase price for such crude oil. (Shields Testimony, Tr. 2097, 2100–01, 1986–87; O'Brien Testimony, Tr. 2329–31; DTX 147B at 1–2; DTX 236 at 1; DTX 241B at 1–2.)

By early 1976, the companies claimed to be losing approximately $1.00 per barrel on each barrel of internal consumption crude they supplied to the Government. (O'Brien Testimony, Tr. 2329–30; PTX 379 at doc. no. 700916.) In mid–1976, the Government royalty alone was $1.97 per barrel on internal consumption crude for which the companies received only $1.48. (PTX 324 at doc. no. 03555; Shields Testimony, Tr. 2097, 2100–01, 1986–87.)

### Income Taxes and Government Royalties

During the 15–month period between July 1974 and September 1975, the Government had raised the income tax rate applicable to the companies from 44% to 71.5%. (PTX 379 at doc. no. 700915.) At the same time, the effective rate rose to approximately 90% because income taxes were calculated by use of the tax reference price. (Gruy Testimony, Tr. 1210–11.)

By operation of Supreme Decree No. 430, which subjected the companies to the 1971 Hydrocarbons Law, the royalty payable by the companies to the Government was raised to 16%. (PTX 51 at 5; DTX 3B, Cl. 23.) By November 1974 the Government had decreed an increase in its royalty to 17%. (O'Brien Testimony, Tr. 2386; PTX 379 at doc. no. 700916.)

### Government–Imposed Production Restriction

In May 1974, the Government authorized the Ministry to establish production limitations that "will not be open to any complaint on the part of the operators." (DTX 188B; Shields Testimony, Tr. 2079.) In September 1974, pursuant to that authority, the Ministry restricted the volume of oil that the companies could produce to a maximum of 210,000 barrels per day, and further pursuant to authority given, the Direcion General de Ministry imposed production restrictions on individual wells in the Coca Concession which, in fact, reduced production to substantially less than 210,-000 barrels per day. (Shields Testimony, Tr. 2079–81, 2084–85, 2087.)

### Decree No. 285

In April 1975, the Government of Ecuador issued Decree No. 285. (DTX 244B.) It provided that the amount of crude CEPE would receive, produced from the 1973 Contract Area (its "equity crude") would no longer be 25% of the *actual* production, as set out in the 1974 Acta, but would be 25% of the *presumed* production figure of 210,-000 barrels per day unilaterally established by the Government. (DTX 244B; Shields Testimony, Tr. 2084–85; O'Brien Testimony, Tr. 2362–66; PTX 324 at 11.) Since the presumed production figure was greater than the companies' actual daily production and the maximum volume of oil the Government permitted the companies to produce (O'Brien Testimony, Tr. 2362–66; 2374–80; Shields Testimony, Tr. 2079–81, 2084–85, 2087), Decree No. 285 effectively increased CEPE's participation percentage above the 25% provided for in the 1973 Exploitation Contract and the 1974 Acta. (O'Brien Testimony, Tr. 2374–80; Shields Testimony, Tr. 2084, 2089; PTX 324 at 11.) Decree No. 285 did not provide for any compensation to be paid to the companies for the increase in CEPE's participation percentage beyond 25% of actual production. (DTX 244B; Shields Testimony, Tr. 2089.)

### The Government's Continued Failure to Pay Its Debts to the Companies

By 1976, in addition to the Government's repudiating its obligation under the 1974 Acta to acquire a 25% interest in the pipeline, CEPE had not completed payment for the companies' producing assets. In the 1974 Acta, it had agreed to compensate the companies for their producing assets by September 6, 1974. (Shields Testimony, Tr. 2075; O'Brien Testimony, Tr. 2388; PTX 324 at 4; DTX 236 at 1, 2; DTX 241B at 2; DTX 291B at doc. no. 03378–79.)

After its participation became effective, CEPE was habitually late in meeting its share of cash calls for 25% of the operating expenses, forcing the companies to pay CEPE's share of the operating expenses until such time as CEPE decided to meet

its obligations. (O'Brien Testimony, Tr. 2356–57; DTX 241B at 2.)

By late 1975, CEPE was also in arrears in its payments to the companies for internal consumption crude which the companies were required to supply to CEPE at the price of $1.48 per barrel. (O'Brien Testimony, Tr. 2357; DTX 241B at 2.)

### Presumptive Production Costs

In December 1975, the Government of Ecuador unilaterally established a presumptive production cost which it used to calculate the companies' income taxes, regardless of whether actual costs were higher than the presumptive cost. (O'Brien Testimony, Tr. 2351–52; DTX 235 at 2; DTX 262B.)

In fact, the companies' actual costs were higher than the presumptive production cost fixed by the Government. (DTX 239B; DTX 262B at 2–3; DTX 236 at 1; DTX 235 at 3.) Thus, the companies were effectively required to pay tax on income they were not earning. (DTX 291B at doc. no. 03390–91.) By late 1975, Ecuadorian Gulf's rate of return on its investment in Ecuador was approximately seven percent. (O'Brien Testimony, Tr. 2325.) The companies' expert, Mr. Gruy, testified at trial that under the circumstances in Ecuador at the time, including the political risks of further expropriatory Government actions, an operator such as Ecuadorian Gulf would reasonably require a rate of return of 20 to 30 percent in order to justify continued operations in Ecuador. (O'Brien Testimony, Tr. 2325–26; Gruy Testimony, Tr. 1129–33.)

In early January 1976, a military junta (the "Junta") consisting of two generals and an admiral seized control of the Government from President Rodriguez Lara. (O'Brien Testimony, Tr. 2335; Shields Testimony, Tr. 2091; PTX 379 at doc. no. 700937.) Several days after it took power, the Junta appointed Colonel Rene Vargas Pazzos ("Colonel Vargas"), former General Manager of CEPE, as Minister of Natural Resources and Energy. (O'Brien Testimony, Tr. 2335; Shields Testimony, Tr. 2091; PTX 379 at doc. no. 700937.) Colonel Vargas was known to the compa-

nies to hold nationalistic, anti-capitalist and anti-oil company views. (O'Brien Testimony, Tr. 2335–36; Shields Testimony, Tr. 2091; PTX 379 at doc. no. 700937; DTX 264.)

Throughout the period from the time the Junta seized power in Ecuador through late August 1976, representatives of the companies met with representatives of the Government to seek relief from the adverse economic measures imposed by the Government. (*See, e.g.,* O'Brien Testimony, Tr. 2336–39, 2348–52, 2361–66, 2380–81, 2390, 2393.) The Government took no remedial action of any kind and in fact intensified such adverse measures. (O'Brien Testimony, Tr. 2396–98; DTX 291B; PTX 332.)

In response to Ecuadorian Gulf's request in February, 1976 for a decrease in the HGT, Minister Vargas announced an *increase* in the HGT of more than double the amount of the increase threatened by the prior regime. (O'Brien Testimony, Tr. 2336.) Minister Vargas' deputy threatened Ecuadorian Gulf with nationalization if it did not accept the proposed further increase in the HGT. (O'Brien Testimony, Tr. 2338–40.)

The companies met with and then submitted a memorandum to the Junta, referred to as the "White Paper" (PTX 324), in which they comprehensively described the problems facing the companies in Ecuador. The essential and underlying problem identified in the White Paper was that:

"The relationship between the Companies and the Government manifests a lack of stability which apparently results from the Government's concept that *the contracts between them are merely administrative in character and, therefore, subject to change at any time by unilateral action by the Government of Ecuador.*" (PTX 324 at doc. no. 03550 (emphasis added); *see* O'Brien Testimony, Tr. 2355; Shields Testimony, Tr. 2094–96.)

The meeting with the Junta and the White Paper did not result in any relief. (O'Brien Testimony, Tr. 2356.) Indeed, shortly after the submission of the White Paper, adverse actions against the compa-

nies were further escalated: CEPE lifted crude oil that exceeded its 25% share of the production without compensating the companies (O'Brien Testimony, Tr. 2356–60; Shields Testimony, Tr. 2090–91; DTX 269); CEPE lifted more internal consumption crude than it was entitled to (O'Brien Testimony, Tr. 2357–59; Shields Testimony, Tr. 2090; DTX 271), refused to pay anything for its internal consumption liftings, and would not even account for the amount of internal consumption crude it had lifted (O'Brien Testimony, Tr. 2357–50); and the Government demanded that the companies deliver to CEPE, without compensation, three million additional barrels of crude, worth approximately $36 million, which the Government claimed based on a retroactive application of Decree No. 285. (O'Brien Testimony, Tr. 2362–66, 2370, 2379.)

The loss of oil overlifted by CEPE placed Ecuadorian Gulf in jeopardy of defaulting on its contracts to supply crude to third parties. (O'Brien Testimony, Tr. 2366.) The companies notified the Government in early June 1976 that if CEPE's overliftings continued there would come a time when there would not be enough crude at the loading terminal to fill the tankers that arrived for loading. (O'Brien Testimony, Tr. 2366.)

In mid-June 1976, when CEPE nominated approximately one million barrels for loading onto the tanker Ruth, CEPE was already overdrawn on its 25% entitlement by some 200,000 barrels. (O'Brien Testimony, Tr. 2367–69.) The companies refused to load the Ruth, but Minister Vargas had it surrounded by armed guards and ordered the port captain to load the Ruth. (O'Brien Testimony, Tr. 2368.)

The crude overlifted by CEPE which was loaded aboard the tanker Ruth was ultimately purchased by Atlantic Richfield Company ("ARCO"). In mid-July, Ecuadorian Gulf sued ARCO in a United States District Court for conversion of the crude oil loaded aboard the tanker Ruth. (O'Brien Testimony, Tr. 2391.)

At this juncture, Ecuardian Gulf's situation was different from that occupied by Texaco Petroleum in that Ecuadorian Gulf stood a much greater risk of having its interest nationalized by the Government than did Texaco Petroleum. Texaco Petroleum was the operator and CEPE did not have the expertise to operate the oil fields by itself. (Shields Testimony, Tr. 2290–91; O'Brien Testimony, Tr. 2326.) As Mr. O'Brien testified:

> [N]o [g]overnment in its right mind would very rapidly nationalize an operator, unless they were able to take over the job themselves.... [CEPE] was clearly incapable of running the consortium by itself, so that Texaco's position was, you might say, a strong one vis-a-vis the Government. (O'Brien Testimony, Tr. 2326–27.)

This view was reflected in statements by the Government and actions by the Government towards Texaco Petroleum beginning in September 1976. (PTX 335 at 2.)

By mid-June 1976, Ecuadorian Gulf officials concluded that Gulf's deteriorated economic position was not likely to improve. (O'Brien Testimony, Tr. 2356.) Thus, in mid-June 1976, Ecuadorian Gulf determined, in protection of its own economic interest, to seek to withdraw from Ecuador.

To catalyze the Government to take remedial action which would allow Ecuadorian Gulf to remain in Ecuador, and to establish an offset for tax overretentions and other debts owed by the Government to it, Ecuadorian Gulf began, in mid-June 1976, to withhold from the Central Bank incautation deposits and to place such deposits in a segregated interest-bearing account. (O'Brien Testimony, Tr. 2382–84.) It was Ecuadorian Gulf's intention to release the escrowed deposits to the Government upon a resolution of the differences between Ecuadorian Gulf and the Government. (O'Brien Testimony, Tr. 2384–89.)

Several weeks after Ecuadorian Gulf notified the Government in July 1976 that it was withholding incautation deposits, Minister Vargas orally notified Ecuadorian Gulf that it would be "caduced" if it did not place the withheld deposits into the Central Bank by the end of August. (O'Brien Testimony, Tr. 2394.) In response to Vargas' threat of caducity, Ecuadorian Gulf pro-

posed a "rollover" procedure under which Ecuadorian Gulf would continue to operate in Ecuador and progressively release deposits to the Government as the individual problems the company faced as a result of the Governments actions were resolved. (O'Brien Testimony, Tr. 2393.) The Junta rejected the company's "rollover" proposal. (O'Brien Testimony, Tr. 2393–94.)

The Junta demanded that Ecuadorian Gulf, as an additional condition to avoid caducity, make all future incautation deposits immediately upon its lifting the crude, which was long before it would receive payment from its customers for the oil. (O'Brien Testimony, Tr. 2399–2400, 2401–02, 2450, 2393–94.) Under the Government regulations in effect at the time of the Junta's demand, the companies were permitted to make incautation deposits up to 120 days *after* lifting. (O'Brien Testimony, Tr. 2393–94; 2401–02, 2449.)

Ecuadorian Gulf did commence making immediate incautation deposits for current liftings, but concluded that it would not accede to the Junta's demand that it release all withheld deposits, as long as the Government's debts to Ecuadorian Gulf continued to exceed the total of such deposits. (O'Brien Testimony, Tr. 2395.) The Junta's new demand that Ecuadorian Gulf make deposits upon lifting and before receiving payment for its crude substantially worsened Ecuadorian Gulf's economic situation by depriving it of credit terms and requiring it to pay the Government the full value of crude sales before it received *any* payment itself. (O'Brien Testimony, Tr. 2396–97.)

As of August 31, 1976, the date Minister Vargas and the Junta had established as the deadline for complying with its conditions for avoiding caducity, the Government had made no payments to Gulf in respect to the tax overretentions or other debts and had taken no remedial action with respect to the companies' other grievances. (DTX 291B.)

### Discussions with the Government Concerning Ecuadorian Gulf's Withdrawal

Perceiving its choice to be "between caducity and nationalization" (O'Brien Testi-

mony, Tr. 2398), Ecuadorian Gulf delivered a letter to the Junta (PTX 332) on August 31, 1976 requesting that the Government and the company enter into negotiations leading to Ecuadorian Gulf's orderly withdrawal from Ecuador. (O'Brien Testimony, Tr. 2396–97.)

On August 31, 1976, the Government issued a formal notice of caducity (DTX 281B) to Ecuadorian Gulf. The notice, which was delivered on September 1, stated that Ecuadorian Gulf would be "caduced" in 30 days if it failed to make incautation deposits for all shipments since June 1976. (O'Brien Testimony, Tr. 2402–03; DTX 281B.) At about the same time that Ecuadorian Gulf received the notice of caducity, the Government threatened that CEPE would not make any further payments in satisfaction of its cash calls unless Ecuadorian Gulf withdrew the ARCO suit. (O'Brien Testimony, Tr. 2407.) Shortly thereafter, Minister Vargas announced that discontinuing the ARCO suit was also a condition for the Government's revocation of the notice of caducity. (O'Brien Testimony, Tr. 2407.)

In mid-September 1976, Ecuadorian Gulf made a further proposal, in a letter from Mr. Wyche to the Junta (DTX 289B), in an attempt to remain in Ecuador. The proposal, which entailed a compromise with the Government over the payment of outstanding incautation deposits, was referred by the Junta to Minister Vargas, who rejected it. (O'Brien Testimony, Tr. 2412–13.)

In conjunction with its attempt to obtain an orderly withdrawal from Ecuador, Ecuadorian Gulf asked the United States Ambassador to seek the local Government's assurance that it would not expropriate Ecuadorian Gulf's interest outright. (O'Brien Testimony, Tr. 2407–08.)

After meeting with one of the members of the Junta, the United States Ambassador reported to Ecuadorian Gulf in late September 1976 that Ecuadorian Gulf would be compensated for the assets on its books, including the Trans–Ecuadorian Pipeline, at their net book value or unrecov-

ered actual cost. (O'Brien Testimony, Tr. 2408; DTX 308 at 1.)

In the course of discussions between Ecuadorian Gulf and the Government concerning Ecuadorian Gulf's withdrawal from Ecuador, the Government emphasized on several occasions that unless there was an agreement satisfactory to the Government, Ecuadorian Gulf would be expropriated and CEPE would begin lifting Gulf's share of production as of January 1, 1977. (O'Brien Testimony, Tr. 2417–18, 2433.)

### The December 1976 Provisional Agreement Between the Government and Ecuadorian Gulf

On December 31, 1976, the Government and Ecuadorian Gulf reached an agreement which provided for Ecuadorian Gulf to transfer its assets to the Government and for the Government to pay for the assets at net book value or unrecovered actual cost. (O'Brien Testimony, Tr. 2424; DTX 296B; Schwind Testimony, Tr. 2893–94.)

During the course of the discussions between Ecuadorian Gulf and the Ecuadorian Government preceding the December 1976 agreement no representative of the Government made any comment about paying Ecuadorian Gulf for: (a) reserves, the right to exploit the reserves, or the right to produce oil; (b) future oil production; or (c) any interest of Norsul in the royalties. (O'Brien Testimony, Tr. 2418–20, 2425–26.) The subject was not discussed.

The December 1976 agreement provides, *inter alia,* that Ecuadorian Gulf "transfers ... its rights in the assets that correspond to it in the present CEPE/TEXACO/GULF consortium and those that correspond to it in the Trans–[E]cuadorian pipeline. Accordingly, [the 1973 Exploitation Contract] is extinguished as to [Ecuadorian] Gulf by reason of transfer." (DTX 295B, Cl. 2.1.)

Clause 2.4 of the agreement provides that the investments of Ecuadorian Gulf in its producing and pipeline assets "shall be established by an audit by an independent specialized European firm of international prestige, designated by the parties." (DTX 295B.) The Government's purpose in requiring an independent audit was to assure itself that it would pay only for the companies' assets at net book value or unrecovered actual cost. (DTX 316B.)

### The 1977 Transfer Agreement

On May 27, 1977, the Government and Ecuadorian Gulf concluded a formal and final transfer agreement (the "1977 Transfer Agreement"). (DTX 304B, PTX 370; O'Brien Testimony, Tr. 2431.) The discussions leading up to the execution of the 1977 Transfer Agreement principally related to resolving outstanding debts which the Government owed to Ecuadorian Gulf and which the company allegedly owed the Government. The basic structure of the transaction, as agreed to on December 31, 1976, did not change. (O'Brien Testimony, Tr. 2431–36.)

At no point in the discussions which took place after the December 1976 agreement and prior to execution of the 1977 Transfer Agreement did the Government or Ecuadorian Gulf suggest or agree that the Government would compensate Ecuadorian Gulf for reserves, rights to exploit reserves or produce oil, or future oil production or any interest of Norsul in the royalties. (O'Brien Testimony, Tr. 2418–19, 2433–34.)

### The 1977 Transaction Audit

By agreement dated September 14, 1978 (the "Audit Agreement"), the international accounting firm of Deloitte, Haskins & Sells ("DHS") was selected to perform "in relation with the transfer of assets from EGOC to CEPE" an audit to determine the book value or cost, less depreciation and amortization, as of December 31, 1976 of Ecuadorian Gulf's assets. (DTX 316B at 3.) As the Audit Agreement expressly provides, the audit was to "determine the *definitive value* ... of the rights and shares of EGOC *in the assets.*" (DTX 316B at 2; emphasis added.) The assets DHS audited did not include reserves, future oil production or the right to produce oil. (DTX 316B at 3.)

DHS concluded its audit in Ecuador and issued its final audit report (DTX 320B) on April 17, 1979. In its report, DHS conclud-

ed that: (a) the actual cost of Ecuadorian Gulf's investment in producing assets and materials and supplies inventory in Ecuador as of December 31, 1976, after deducting depreciation and amortization, was $74,792,625; (b) the cost of Ecuadorian Pipeline, after deducting depreciation and amortization, was $42,020,000; and (c) the Government of Ecuador still owed Ecuadorian Gulf the sum of $1,208,478 in respect of the 1974 transaction.

Ecuadorian Gulf received $114,370,141 from the Government of Ecuador in connection with the 1977 transaction and $1,208,478 as the balance owed by the Government in respect of the 1974 transaction, for a total of $115,578,619. The foregoing total amount was paid in two installments: $82,128,000 on May 27, 1977; and $33,450,619 on April 25, 1979.

There was no credible evidence to refute defendants' evidence that the amount the Government paid to Ecuadorian Gulf was precisely equal to the cost of Ecuadorian Gulf's investment in the producing assets, materials and supplies inventory and the pipeline, less depreciation and amortization, as of December 31, 1976. Plaintiff's opposition to defendants' position was essentially theoretical.

The payment of the $82 million was made to Gulf Oil Corporation directly for deposit to an account held on behalf of Ecuadorian Gulf. (PTX 370, p. 20; Tr. 2500.) The final payment of $33,450,619 was made to Gulf Oil corporation directly for deposit to a Gulf account with the Mellon Bank, Pittsburgh. (PTX 379, p. 700976; Tr. 2502.) This fact, of course, is directly relevant to the parent liability issue discussed hereafter.

## CONCLUSIONS OF LAW

### I. PLAINTIFF'S BREACH OF CONTRACT CLAIM FOR ROYALTIES ON CEPE'S OIL

#### A. *Choice of Law*

■ Under Florida's choice of law rules, which are to be applied in this diversity action, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021,

85 L.Ed. 1477 (1941), "the nature, validity and interpretation of contracts are to be governed by the substantive law of the country or state where the contracts are made or are to be performed...." *Goodman v. Olsen*, 305 So.2d 753, 755 (Fla. 1974), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975); *accord, Morgan Walton Props. v. International City Bank*, 404 So.2d 1059 (Fla.1981); *Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293, 1295 (5th Cir.1972).

Plaintiff's breach of contract claim raises pure questions of interpretation: whether under the provisions of the 1965 Contract and the Transfer Agreement the companies are liable for royalties on production from the Coca Concession that CEPE owned and received after the 1974 and 1977 transactions.

The 1965 Contract was negotiated and executed in Ecuador. The Transfer Agreement, by which Minas transferred the Coca Concession to the Ecuadorian corporate affiliates of the companies, was prepared and executed in Ecuador and filed with an Ecuadorian notary after approval of the transfer of the Coca Concession was obtained from the Government of Ecuador.

Because the 1965 Contract and the 1966 Transfer Agreement were negotiated and executed in Ecuador, Ecuadorian law must be applied to resolve plaintiff's breach of contract claim for royalties on CEPE's oil.

#### B. *Acts of State Precluding Payments of Royalties on CEPE's Oil*

■ Article 6 of Ministerial Resolution No. 11927, issued by the Minister on June 3, 1974, and the Article Third of the Judgment issued by the Minister on October 2, 1974 (the "Judgment") reflect the law of Ecuador applicable to the issue of whether Norsul is entitled to receive royalties on oil production from the Coca Concession that CEPE owned and received after the 1974 and 1977 transactions.

The Resolution and the Judgment are valid public acts of a recognized sovereign power, the Republic of Ecuador, committed within its territory. Furthermore, regardless of how we view the action from the

standpoint of responsible contract law, both were issued to carry out the public interest of the Ecuadorian State in the royalties. When CEPE became the owner of 25% of the production from the Coca Concession, the issue of whether royalties would be paid on such production became a matter of public interest and the Resolution and Judgment addressed the matter. (Jarrin Testimony, Tr. 2769–71.)

The Resolution and the Judgment regulate payments on oil production from an Ecuadorian oil concession and such payments are within the regulatory authority of the Minister of Natural Resources. (Jarrin Testimony, Tr. 2766–69; Arauz Testimony, Tr. 2641–44.)

A failure by this court to apply the Resolution and Judgment to Norsul's breach of contract claim would amount to a determination that public acts of the Republic of Ecuador are invalid. That determination is prohibited by the Act of State doctrine. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964) ("the act of state doctrine ... precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory"); *accord, Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909); *O.N.E. Shipping Ltd. v. Flota Mercante Gran-colombiana,* 830 F.2d 449, 452–53 (2d Cir.1987); *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 73 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

■ A further reason for finding that no royalties were due on CEPE's oil is based on the language of the contract governing those royalties. The 1965 Contract provides that:

"[C]essionaires shall pay to transferor: 1. An amount which represents the value, as hereinbelow defined, of two percent (2%) of the net production, as also defined hereinbelow, of all crude oil produced in the transfer zone, obtained, not wasted nor lost, and not used in the same

works of exploration, exploitation and transportation, and *sold or delivered by the cessionaires* from the storage tanks at the gathering Center." PTX 26, Cl. 6(a) (emphasis added).

The plain meaning of clause 6(a) is that the companies (cessionaires) were obligated to pay royalties only on oil that they themselves sold. An argument can be made from the use of the words "... or delivered ...," but such an argument runs counter to the reasonable meaning of the provision. The royalty is to be paid for produced oil over which defendants have control. Indeed, the argument that the parties contemplated continued full royalty payments regardless of the extent of de facto nationalization is not persuasive. Absent any new contractual obligation entered into between the parties, wherein the companies would agree to modify the terms of the obligation to continue making royalty payments on oil that they did not sell, the court can find no such obligation in the contract. Therefore, the court finds that the 1965 Contract does not obligate the companies to pay royalties on oil obtained by CEPE after the 1974 and 1977 transactions.

■ Norsul argued at trial that the only way the rights to receive royalties could be extinguished under Ecuadorian law would have been for the parties to agree to a novation, or for the Government to declare a caducity. As neither event occurred, plaintiff asserts, the royalty rights had to continue after the 1974 and 1977 transactions, and either the companies or CEPE had to be obligated to pay them.

It was clear that the Government of Ecuador would not make royalty payments on oil it produced and sold. Resolution 11927, which had the force of law in Ecuador, provided that:

"commencing on the date in which the state Ecuadorian Petroleum Company, CEPE becomes a participant of the 25% ... there shall be excluded, in order to carry out the assessment of the 2%, the percentage of CEPE in the net production mentioned in Articles 1 and 3 of this regulation." (DTX 198B, cl. 6.)

This clause makes clear that as to the 1974 transaction, the Government would not make royalty payments on CEPE's oil. Minister Jarrin also made clear that CEPE would make no royalty payments on its oil. (Tr. 2770–71.) The Judgment provided that

"the exclusion established in Article 6 of the Ministerial Resolution No. 11927 of June 3, 1974, with respect to the participation of "CEPE" is merely indicative and it shall be understood that it is also valid for any increase which may be obtained in that respect." (DTX 214B, Art. Third.)

This language makes clear that the Government would not assume royalty payments for any future acquisition of oil from the transfer zone, e.g. that acquired from Gulf in 1977.

As it is clear that the Government of Ecuador would not assume the obligation to pay the royalties, and that the contract provided that the companies would pay royalties only on oil they sold, the Government, in effect, caduced the plaintiff's royalty rights. While it can be, and was argued that such an action by the Government of Ecuador required a payment by the Government to the caduced rights holder, the Government viewed the oil as the inalienable patrimony of the state absolving it of duty to compensate for the "rights". The record is replete with statements made by Ecuadorian officials regarding the patrimony (oil) of the state and the objection of some to the concept that entities who did not work the fields nonetheless could obtain royalties. The record is quite clear that while the government would not interfere with the private contract for royalties, it had no intention of paying royalties on the interests taken. Thus, while no formal declaration of caducity occurred, the court finds that the Government did in fact extinguish Norsul's rights when it took over the production and sale of the oil from the transfer zone. Therefore, the court finds the companies had no continuing obligation to pay royalties on that oil taken over by CEPE.

## II. NORSUL'S BREACH OF CONTRACT CLAIMS FOR UNDERPAYMENTS OF ROYALTIES

■ Plaintiff's breach of contract claim for the underpayment of royalties is a question of interpretation of the 1965 Contract to be determined under Ecuadorian law.

Since the contract calls for the royalty to be 2% (1% to Norsul) of the net production of oil sold or delivered, the issue which was forced by the shifting positions of defendants is what price and volume bases should have been used to calculate the royalty.

The 1965 Contract provides:

*Sixth*

(b) For purposes of this contract, the value of the crude oil and the natural gasoline mentioned or referred to in the present clause shall be understood as the value defined in each case for the purpose of calculating the payment of the royalties which cessionaires must make to the Government, but in the proportion below established. Accordingly, the percentages established in this clause, which the cessionaires must pay to transferor, shall be calculated on the bases of the quantities, prices or values which must be fixed for the total net production from the transfer zone, in order to establish the natural gasoline and calculate the royalty payments that the cessionaires must make to the Government.

(c) As net production, mentioned or referred to in the present clause for the purposes of this deed, shall be understood net production as defined and established for the prupose of royalty payments to the Government of Ecuador. (PTX 26.)

The royalties for the disputed quarters were paid on the basis of the current price of West Texas crude (adjusted by transportation costs), with a 10% reduction in volume. The companies argued that the 1965 Contract required reference to the 1961 Concession Agreement for the royalty basis. The 1965 Contract provided:

*Eighth*

a) The parties agree that in case of divergence between them as respects the

application and fulfillment of the agreement contained in the two preceeding clauses, that is, clause Sixth and Seventh of this instrument they shall abide, in all cases, in accordance with the provisions in letter b) of Clause Sixth to establish the volume of production on which the royalties in money on the price of oil and on the price of the natural gasoline are to be calculated, etc., to what may be established as such volumes and prices, as the case may be, in the relations between the cessionaires and the Government; because it is the intention of the parties that the calculations to be made for the payments to transferor, are to be made on the same bases established for the respective payments to the Government, according to the contract. (PTX 26.)

Defendant argues that the language "according to the contract" refers to the 1961 Concession Agreement. The 1965 Contract elsewhere states that "The (1961) petroleum concession contract, executed between the government and the transferor ... may be simply called "The Contract" or "Contract". (PTX 26, Cl. 1(h)(IV).)"

The court finds that while Clause 8(a) of the 1965 Contract could conceivably be read to refer to the 1961 Concession Agreement, it does not create an ambiguity in the otherwise clear language of the contract. The many references to the Government royalty price, without further description or clarification, leads the court to conclude that it was the Government royalty price and not a formula from the 1961 Concession Agreement, incorporated through an obscure and questionable reference to that contract at one place in the 1965 Agreement, which controlled the royalty basis. Interestingly, (and as developed more completely in the fact findings) defendants had previously insisted on the government tax reference price as the basis for royalty payments. At that time, well prior to the oil crisis, the government price was lower and defendants insisted on a renewed arrangement (apparently unnecessary) to force the point. The defendants' position in reference to the three quarters under consideration was less than honorable and clearly in breach of the agreements.

It is apparent that the companies forced the use of the Texas crude price basis at the same time that the 1973 Arab oil embargo caused the world price of oil to rise dramatically. The Texas oil price was being maintained at an artificially low level by United States government regulation. Thus, the use of the Texas price would result in paying royalties at a rate lower than warranted by the Government royalty price.

In conclusion on this point, the court finds that clauses 6 and 7 unambiguously set the Government royalty price as the basis for the two percent royalties. The payments for three quarters based on the lower Texas price constituted a breach of the contract.

■ The companies further argued that Resolution 11927 states the law of Ecuador concerning the basis for the royalty payments. (DTX 198B.) Articles 10 and 11 of the Resolution read:

Art. 10. The Central Bank of Ecuador, with the participation of the representatives of the General Hydrocarbons Office and the National Development Bank will proceed to audit the assessments of the payment of the 2% made prior to issuing the present Regulation and shall carry out reassessments corresponding to the 86% of the National Development Bank.

Art. 11. Provisions of the present Regulation, insofar as they refer to the 14% of the successors in the rights of the grantees, shall be applied from the present date without prejudice to publication in the Official Registry.

The companies interpret this Article to resolve against Norsul its claim for use of the Government royalty price as a basis for the royalties for the disputed quarters. Those quarters, argue the companies, preceeded the issuance of 11927. Articles 10 and 11 indicate that while the Government intended to reassess the taxable portion of the royalty payments, retroactively, it intended for the remaining share belonging to Norsul and Phoenix to be reassessed only prospectively. Thus, the companies

**1544**

conclude, the Government rejected Norsul's claim for recalculating the disputed quarters, as regards the royalty payments from the companies to Norsul.

The court finds that Resolution 11927 does not determine that the payments of royalties based on the West Texas price was proper under Ecuadorian law. The Resolution in its preamble states that its purpose was "to terminate the disagreements arising out of the assessment and payment of two percent of the net production established in Clause Sixth of the [1965 Contract]...." The Resolution concluded, as this court has, that the proper royalty basis under the 1965 Contract was the Government royalty price. While it is true that the Resolution does not require the reassessment of royalties previously underpaid to Norsul, such an omission does not imply a positive statement that the law of Ecuador precluded such a recovery. The better interpretation of that omission is that the Government did not intend to regulate the private contractual obligations between these parties, leaving Norsul to pursue its claim in a proper forum. The court heard expert testimony that the author of the Resolution, the Minister of Natural and Energy Resources, did not have jurisdiction to resolve private disputes involving private contracts. The court therefore concludes that Regulation 11927 does not alter the obligation established in the 1965 Contract for the companies to pay royalties based on the Government royalty price.

### III. UNJUST ENRICHMENT

■ The court previously has determined that the substantive law to be applied to resolve Norsul's unjust enrichment claim is the law of Ecuador. *Norsul Oil & Mining Co., Ltd. v. Texaco Inc.*, 641 F.Supp. 1502, 1512 (S.D.Fla.1986).

Under the law of Ecuador, a plaintiff seeking to establish unjust enrichment must prove, at a minimum, that a benefit has been conferred on the defendant to which the plaintiff is entitled. (Schwind Testimony, Tr. 2843, 2844, 2874, 2876–2877, 2898–2899, 3107; Moscoso Testimony, Tr.

829, 525.) When the benefit conferred on the defendant is a payment of money, there can be no unjust enrichment unless, at a minimum, a quantifiable part of the payment is for something that belongs to plaintiff. (Schwind Testimony, Tr. 3107; Moscoso Testimony, Tr. 829, 540, 589–90, 596.)

Norsul failed at trial to prove unjust enrichment. The evidence showed that the Government paid the companies only for the producing and pipeline assets acquired by CEPE in the 1974 and 1977 transactions, and did not pay the companies for the right to exploit oil reserves. The amounts which the government paid to the companies in the 1974 and 1977 transactions were precisely equal to the companies' investments in their producing and pipeline assets, valued at cost.

The language in the operative portion of the 1974 Acta, through which CEPE acquired its 25% interest, paragraphs 3 and 6 demonstrates that the Government agreed to pay only for the companies' unrecovered investments, equipment, supplies, and inventory. There is nothing in the 1974 Acta indicating that the Government agreed to pay for anything other than unrecovered investments and equipment and supplies inventory. As reflected by the testimony of Minister Jarrin and his legal advisor, Dr. Luis A. Arauz, as well as the companies' witnesses, the intention underlying the 1974 Acta was that the Government would pay Texaco Petroleum and Ecuadorian Gulf only for their investments, valued at cost less depreciation and amortization.

The 1977 Transfer Agreement clearly states that the Government was paying for assets. Clause 2.1, which defines what is being "transferred" by the "present agreement," states that "Gulf transfers (to) CEPE ... its rights *in the assets* that correspond to it in the CEPE/Texaco/Gulf Consortium," and Clauses 2.2 and 2.3 provide that the Government will pay Ecuadorian Gulf only "the amount of the investments not amortized." (Emphasis added.)

In any event, Norsul's experts admitted that in the 1974 and 1977 transactions the Governments paid the companies *some-*

*thing* for their unrecovered investments. (Moscoso Testimony, Tr. 874; Gruy Testimony, Tr. 1187–89, 1191–92.) Despite this admission, Norsul failed to adduce any evidence from which the court can determine which part, if any, of the Government's payment was for rights to exploit oil. Thus, even if Norsul's interest in the royalties were an interest in the companies' rights to exploit oil, and some of money was paid to the companies for those rights, Norsul has provided no basis for determining how much was paid for such rights. The court cannot speculate on the matter of how much was paid for rights, and therefore, the court finds that Norsul has failed to meet its burden of proof in this regard.

However, this failure, under the circumstances of the evidence in this case, has only academic significance. The concurrence of the accountant's findings regarding net investment value and the clearly expressed intent of the Ecuadorian officials compel the conclusion that Defendants received no payment for "rights." Thus, the payments made to defendants in connection with the 1974 and 1976–1977 "takings" did not include any amount which enriched them at the expense of plaintiff.

## IV. BREACH OF FIDUCIARY DUTY

■ Norsul's fiduciary duty claim is essentially a tort claim primarily predicated on the contention that transfer of the companies' interests to CEPE in 1974 and 1977, unaccompanied by royalties on CEPE's oil from either CEPE or the companies, breached alleged duties to maximize Norsul's interest in future royalties or to take affirmative action to protect Norsul's interest in receiving future royalties.

Under Florida law, the "most significant relationships test" is to be applied to determine the law governing tort claims. *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980). Since this Court's jurisdiction is predicated on diversity of citizenship, it is bound to apply the Florida rule. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

All of the discussions between the Ecuadorian officials and the companies leading up to the 1974 and 1977 transactions, and the transactions themselves, took place exclusively in Ecuador. Additionally, the oil concession which is the general subject of the transactions is, of course, located in Ecuador. Thus, Ecuador has the most significant relationship to plaintiff's fiduciary duty claim, and the law of Ecuador must be applied to this issue. The court further finds, however, that the application of the law of Ecuador and the law of Florida would lead to the same result concerning Norsul's breach of fiduciary duty claim.

■ In attempting to support its claim that the companies had a fiduciary duty to Norsul under the law of Ecuador, Norsul advanced four theories: (i) provisions in the 1965 Contract pertaining to the calculation of the royalties gave rise to an agency relationship between Minas and the companies (DTX 430 at ¶¶ 7, 8); (ii) the fact that the companies acquired the 1961 Concession by assignment from Minas, *ipso facto*, establishes an "agency relationship between them" (DTX 430 at ¶ 7); (iii) a quasi-contractual relationship exists between the companies and Norsul which requires the companies to act as Norsul's fiduciaries; and (iv) the general obligation under Ecuadorian law to perform contracts in "good faith" imposes an affirmative duty on each contracting party to protect the interests of the other contracting party. (DTX 430 at ¶¶ 5, 6.)

The evidence adduced at trial did not support any of the theories underlying Norsul's claim of breach of fiduciary duty and the court concludes that the claim must be rejected.

### A. *Agency Relationship*

■ The 1965 Contract does not create an agency relationship between the companies and Norsul. It is the law of Ecuador, as it is under the common law, that agency is a consensual relationship, created only if the agent agrees to accept the relationship. (Schwind Testimony, Tr. 2956; Restatement (Second) of Agency § 15 (1984).) The nature of the relationship created by the

companies' agreement to make royalty payments to Minas must be determined from both the 1965 Contract and the Transfer Agreement. (Schwind Testimony, Tr. 2847).

The two agreements constituted a single transaction which gave rise to the royalty payments. (Schwind Testimony, Tr. 2847.) The promise to execute the Transfer Agreement is part of the consideration given by Minas for the royalty payments. (Schwind Testimony, Tr. 2846–47). The text of the Transfer Agreement was attached to the 1965 Contract and the parties to the 1965 Contract explicitly acknowledged in the contract that they "accepted" the terms of the draft of the Transfer Agreements.

Furthermore, under Article 1607 of the Civil Code of Ecuador, the terms of one contract "may be interpreted by [the terms] of another contract between the same parties and dealing with the same subject matter." (Schwind Testimony, Tr. 2847–88; see Moscoso Testimony, Tr. 531.)

In both the draft Transfer Agreement, attached to the 1965 Contract as Annex No. 1, and the actual Transfer Agreement, Minas and the companies unequivocally agreed that *no* agency relationship would exist between them. (Schwind Testimony, Tr. 2868, 2957, 3123.) Both documents provide that the contractual relationship between Minas and the companies:

> does not imply partnership nor joint accounts; nor imposes upon any of them the obligations that the partners of an association or company may have between them; nor confers to any of the parties the capacity of agent, servant, or employee of the other. (1965 Contract, Annex 1, Cl. 5; 1966 Transfer Agreement, Cl. 5.)

The court finds that since Clause Fifth of both Annex No. 1 to the 1965 Contract and Contract and the Transfer Agreement deny the creation of any agency relationship, no agency could have been created by the contractual relationship between Minas and the companies.

There would be no basis for inferring an agency relationship even if Minas and the

companies had not expressly agreed that their relationship would not be an agency relationship. Clauses 7(b) and 8(a) of the 1965 Contract, cited by Norsul, would not provide any basis for inferring that Minas was "entrusting" the companies with the "management" of any of its business, as required under the provisions of Ecuador's Civil Code relied on by Norsul for its agency argument.

### B. *Assignment of Rights as Creating a Fiduciary Relationship*

■ Norsul further contends that assignment of the 1961 Concession Contract by Minas to the companies, without more, creates a relationship which imposed upon the companies those duties owed by an agent to its principal under the Civil Code of Ecuador. (DTX 430 at ¶ 6, at p. 9; Moscoso Testimony, Tr. 680.) Nothing in the Civil Code of Ecuador provides that the mere assignment of a contract creates a relationship imposing the duties of an agent on the assignee. (Schwind Testimony, Tr. 2958.)

The only Ecuadorian authority cited by Norsul for its assignment theory of agency is the headnote to, or synopsis of, a 70–year–old decision of the Supreme Court of Ecuador, *Morejon v. Penaherra.* (*See* DTX 430, at 12 & n. 11; Moscoso Testimony, Tr. 678.) As Mr. Moscoso admitted, the sole issue in *Morejon* was procedural. The *Morejon* case has nothing to do with any duties, fiduciary or otherwise, running between the assignor and the assignee of rights under a contract. (Moscoso Testimony, Tr. 681, 678; Schwind Testimony, Tr. 2959.) Therefore, the court finds that the assignment of rights in the 1965 Contract did not create an agency relationship under Ecuadorian law.

### C. *Quasi–Contract*

■ Under the law of Ecuador, a quasi-contract is a relationship which is inferred from actions taken by parties who do *not* otherwise have an agreement which governs their relationship. (Schwind Testimony, Tr. 2840, 2842.) The court concludes that since the 1965 Contract and Transfer Agreement establish the rights and obligations of Minas and the companies, no

quasi-contractual relationship could exist between the companies and Norsul. (Schwind Testimony, Tr. 2840.)

### D. Comparison of the Civil Law Obligation of Good Faith to Common Law Fiduciary Duties

The civil law concept of good faith in contracts creates circumscribed duties which must be derived from the intent of the contracting parties. Under the "good faith" provision of Ecuador's Civil Code, Article 1589, the express obligations created by a contract may be supplemented only by such obligations as are necessary to carry out the expressed intent of the parties. (Schwind Testimony, Tr. 2923; Moscoso Testimony, Tr. 527, 795, 908, 916.) Good faith does not give rise to a set of duties wholly distinct from those specified in the contract, as would be the case in a fiduciary relationship under the common law. (Schwind Testimony, Tr. 2923–24.)

The provisions of the 1965 Contract and the Instrument of Conveyance make clear that, upon transfer, the concession was to be operated with the companies' economic interests a primary consideration. Thus, good faith could not require the companies to take any actions to maximize, advance or protect Norsul's interest in receiving the royalties, if such actions were inconsistent with the companies proper interests.

Defendants participation in 1974 and 1977 transactions could not violate the obligation of good faith if they decided to enter into the transactions for legitimate reasons growing out of their own economic interests. The duty of good faith would be violated only if the companies decided to enter into the transactions with the primary objective of avoiding the obligation to make royalty payments to Norsul. (Schwind Testimony, Tr. 2936, 2945, 3099, 3103.)

As demonstrated in *Tidelands Royalty B Corp. v. Gulf Oil Corp.*, 804 F.2d 1344 (5th Cir.1986), a case which addresses the application of the civil law duty of good faith to the holder of an overriding royalty, good faith does not impose an affirmative duty on the operator to protect the interests of the royalty holder. Good faith only proscribes action devised to deprive the royalty holder of the benefits of its bargain.

In *Tidelands*, the plaintiff, which held an overriding royalty granted by Gulf, claimed that Gulf had an obligation to protect it against drainage and had breached the obligation by not drilling on the parcel subject to plaintiff's royalty. The Court of Appeals for the Fifth Circuit, applying the civil law of Louisiana, analyzed the scope of the good faith obligation in the specific context of a royalty agreement and held that the obligation of good faith did "not create an affirmative duty to protect Tideland's interest." *Tidelands*, 804 F.2d at 1353.

In Judge Wisdom's opinion, the Court first concluded that the "royalty owner's interest is speculative: a hope that the grantor's own interest in securing production will, in fact, result in production from the tract burdened by the royalty." *Id.* at 1352. In other words, by its very nature, a royalty is dependent on the operator's decision that producing serves its own economic interest. Having thus analyzed the nature of a royalty interest, the court held that the obligation to perform the royalty agreement in good faith would not be breached unless the operator took action "to gain an advantage that is derived solely by avoiding the royalty." *Id.* at 1353.

The companies could act to advance their own economic interests, as they reasonably assessed them, even if their actions diminished the value of Norsul's interests. They could not take action calculated to enable them to avoid their obligation to pay royalties. Therefore, as the plaintiff has not shown that the companies took any actions to avoid the royalty, (as far as the Government takings were concerned) the court finds they did not breach their obligation of good faith." As indicated, this conclusion is limited to the "takings" of the Government of Ecuador. The conduct of the Government was arbitrary and in disregard of its agreements and applicable Ecuadorian law. The latter part of the preceeding comment may beg questions, however, as the governments in charge dealing with the

companies and Norsul seemed to develop the applicable law as it served their interests. Thus, aside from the contractual right to pursue their own legitimate interests, the companies, and particularly Gulf at the end, had little choice in the transfer transactions and were, indeed, told what they and it could transfer. As to the earlier royalty payments and the determination of the basis for payment, it is clear that the companies conduct is not entitled to the appellation "good faith." The Court has already reviewed that part of plaintiffs claim and will not comment further here on defendants role.

### E. *Custom and Practice*

■ Norsul further contends that as a matter of "custom and practice" the owner of a "working interest" is a fiduciary of the owner of a royalty interest and that such custom and practice legally obligates the companies affirmatively to protect Norsul's interest. (Gruy Testimony, Tr. 1053, 1101.)

■ The court finds, however, that in the oil industry, a contract prevails over any obligations which are imposed by custom or practice. (Tr. 1101, 1135, 2211.) Since the 1965 Contract and Transfer Agreement clearly express the intent of Minas and the companies to create an arm's-length relationship, custom and practice cannot impose on the companies a fiduciary duty to Norsul.

■ Further, the court finds that the owner of a working interest has no duty to advance the interest of a royalty holder if such actions require that its own economic interests are not advanced. (Tr. 1127–29; 1137–39.)

■ Plaintiff's expert Henry Gruy testified that when a lease becomes uneconomic, the working interest has a right to abandon it. Similarly, the working interest does not have to pursue development where making less than a "reasonable profit." With respect to an operation located in an OPEC country progressively moving toward nationalization of its oil industry, a reasonable operator would require an after-tax return on investment of between 20% to 30% in order to remain in business. (Tr.

1129–33; 2325–26.) As Gulf in 1976 did not realize a return in the range of 20% to 30%, it could not be required, under the industry custom or practice, to continue operations to advance the interest of the royalty holder. Shortly before Gulf's transfer in 1976–1977, its return was in the 7% area. (Tr. 1129–32). Therefore, the court finds that the custom and practice in the oil industry did not create the fiduciary duty claimed by plaintiff.

### F. *The 1974 and 1977 Transactions*

■ CEPE's 25% participation in 1974 was decreed by the Government. Therefore, the court holds that the companies did not breach any obligation of good faith by complying with the dictates of a sovereign government, in that such participation cannot be said to have been taken to evade paying royalties.

The court further finds that Gulf did not withdraw from Ecuador in 1977 to evade the royalty payments. Rather, Gulf acted reasonably in determining that its own proper business interests, unrelated to its obligation to pay royalties, required that it leave Ecuador. Therefore, the court holds that Gulf did not breach its obligation to act in good faith when it withdrew from Ecuador in 1977.

### V. NORSUL IS NOT ENTITLED TO RECOVER PUNITIVE DAMAGES

Since the court has ruled that Norsul is not entitled to recover on its contract claim regarding the 1974 and 1977 transactions, or its breach of fiduciary duty claim, there is no occasion to consider punitive damages. The contract issues on which the court has found in Norsul's favor are not claimed to warrant punitive damages.

### VI. NORSUL IS ENTITLED TO ROYALTY PAYMENTS ON OIL PRODUCED AT SHUSHUFINDI BY VIRTUE OF THE 1970 STIPULATION

Before concluding on the Shushufindi # 1 issue, brief reference again to some of the pertinent facts may be helpful. Prior to the New York litigation in which the companies stipulated as to the location of

the well (within Coca), there had been an actual boundary dispute between the parties. Texaco and Gulf were involved in the dispute. The resolution was the northward movement of the boundary approximately 1400 meters. Apparently not satisfied with this result, defendants then conducted two ground surveys. The results as determined from monumented and approved boundary lines placed the well in the Coca concession.

In the New York District Court litigation, born of a securities complaint, (in which claims as to the location of Shushufindi #1 was a principal issue) the parties agreed as to the location of the well—in Coca. On the basis of this agreement, the case was concluded. Here, defendants say they really did not mean forever. They point to the use of the word "presently" as permitting a certain amount of elasticity in the stipulation which led to the conclusion of the case.

Norsul argues that the stipulation forms a valid, binding contract on the parties who signed it. *See Raphael v. Booth Memorial Hospital*, 67 A.D.2d 702, 412 N.Y.S.2d 409 (1979); *see also Term Industries, Inc. v. Essbee Estates, Inc.*, 88 A.D.2d 823, 451 N.Y.S.2d 128 (1982). *Raphael* states that a "stipulation of settlement, which was definite and complete on its face, and spread upon the record in open court, constitute[s] a valid and binding contract between plaintiff and the (third party defendant)...." *Raphael*, 412 N.Y.S.2d at 411. Norsul further argues that the stipulation clearly establishes the location of Shushufindi as within Coca, and establishes the duty of the companies to pay royalties on Shushufindi oil. Thus, Norsul contends, defendants have breached their contractual duty to pay those royalties subsequent to January 1, 1976.

The companies do not dispute Norsul's legal theory, but argue that the stipulation is not "definite and complete" on its face. The companies maintain that the words "presently located" indicate that the parties were not agreeing to be bound in the future to the location of Shushufindi in Coca.

Examining the stipulation only within its four corners, the court finds that it manifests the intent of the parties to locate Shushufindi within Coca for the purposes of royalty payments. There is no express reservation of the companies' right to pursue further surveying for purposes of relocating Shushufindi. Of course, the well itself could not move; neither does the stipulation indicate that the Coca boundaries could. The court further notes that the operative language of the stipulation reads that "Minas y Petroleos ..., its successors and assigns, *are entitled* to two percent of the net production of said well as defined in their private contract dated July 16, 1965...." PTX 69, *emphasis added*. Thus, a reasonable reading of the stipulation indicates that it was meant to bind the companies to pay royalties on an ongoing basis, as per the 1965 Contract. It does not indicate any reservations.

While the court finds no ambiguity in the stipulation, it has looked beyond the stipulation itself to determine the context in which it was entered. This examination was to determine if the parties intended the words "presently located" to refer to past considerations, as Norsul contends, or to future considerations, as the companies contend.

The companies maintain that the use of the words "presently located" in the stipulation make it clear that the parties to the stipulation were not undertaking to establish the permanent location or to preclude subsequent litigation over the obligation to pay royalties on the well irrespective of its relocation in the future. The companies point to the fact that the boundaries of Coca and Napo had already moved twice in 1969, and only an allegedly inaccurate survey had located Shushufindi at that point in time within Napo. (DTX 349.)

Norsul argues that the word "presently located", when read in light of the background to the New York litigation, does not generate any ambiguity in the stipulation with regard to possible future relocation of Shushufindi. The litigation arose out of an investigation of Norsul by the SEC regarding its announcement that Shushufindi was

in Coca. Norsul argues that the defendant companies could not admit that the well had been located in Coca before June, 1969 without exposure to securities lawsuits. Thus, the words "presently located" in Norsul's view refers to past events, not future relocations of the boundaries.

The court finds that Norsul's view is more reasonable. If defendants did wish to reserve any rights to relitigate the location of Shushufindi, the proper course would have been to refuse to stipulate to its location in a declaratory judgment action. The more reasonable approach would have been to refuse the stipulation and litigate the issues by producing definitive surveys and other evidence reviewable in the New York District Court. The stipulation reasonably appears to spell the end the issue of the well's location, while insulating the companies from liability for past actions. Therefore, this court concludes that the companies are obligated by the stipulation to continue paying royalties on Shushufindi, and that the companies' failure to continue those payments after 1976 constituted a breach of that obligation. The circumstances surrounding the later survey are not entirely clear. While there apparently may be some question about the validity—preciseness—of the type of survey done, one thing is clear—plaintiff had no part in it. It is noteworthy that at a meeting in March of 1984 when defendants were making demands on plaintiff Norsul/Phoenix were threatened with both a propaganda campaign and a boundary dispute (Fowler testimony 2/1/88). While there is no evidence that defendants inspired the later survey, and while the government accepted the survey, the Court is persuaded that the resurvey is simply not binding on Norsul. Aside from the legally binding result of the New York action, the circumstances of the resurvey are not such as to inspire a sufficient level of confidence to bear meaningfully on the compelling effect of the agreement between the parties disposing of the New York case and settling the royalty obligation of defendants in regard to Shushufindi #1.

## VII. PARTIES LIABLE

 The court finds that the parent corporations, Texaco Inc. and Gulf Oil Corporation, are liable for all the damages awarded in this case.

Regarding the damages as a result of the breach of the stipulation regarding Shushufindi, the court finds that the parents themselves were the parties to that stipulation, and are therefore liable for the breach.

Regarding the underpayments of royalties for the three quarters, the court notes initially that the subsidiary companies were the signatories to the contract. Further, the Delaware subsidiaries, Texaco Petroleum and Ecuadorian Gulf, were responsible for the day to day operations of the consortium. However, a number of factors lead the court to conclude that the subsidiaries were agents of the parents with respect to the 1965 Contract and the subsequent underpayments.

As the Fifth Circuit recognized in a case with similar facts to the present one: "When a parent corporation dominates a subsidiary so that the subsidiary is an instrumentality or agent of the parent corporation, courts frequently disregard the corporate fiction. The parent corporation may be held liable on the contract obligations of its subsidiary." *Fitz–Patrick v. Commonwealth Oil Company*, 285 F.2d 726, 730 (5th Cir.1960) (citations omitted).

The totality of circumstances surrounding the underpayments leads the court to conclude that the parents should be liable for them. The subsidiaries were run by CEO's each of whom ran a number of similar subsidiaries in various Latin American countries. The CEO's reported to officers of the parents. When the parties renegotiated the royalty payments, the meetings were held at the offices of one of the parents in Coral Gables. A further significant event was the refusal of a representative of one of the subsidiaries to release a royalty check to Norsul and Phoenix, claiming the check had to be released from Coral Gables (i.e. from the parents). A final event the court notes, although it occurred

sometime after the underpayments, was that the payment to Gulf following the 1977 Transaction was made directly to a Gulf Oil Corporation account. Therefore, the court concludes as a matter of law that the parent companies are liable as principles for any acts of their agents, the subsidiaries, with respect to the underpayments of royalties.

## VIII. DAMAGES

The Court has accepted defendants' position that Ecuadorian law governs the claims in connection with the 1965 contract but also finds that the result would have been similar under domestic law. The Shushufindi claim for damages will be governed by New York law and the New York interest rates will be applied. Changes in the rate over the applicable time will be recognized.

The underpayments and the Shushufindi royalties are liquidated claims and are subject to pre-judgment interest.

For Shushufindi royalties, the damages, including pre-judgment interest as provided by New York law, (the mathmatics having been agreed to by the parties) total $1,717,972.36 plus $277.62 daily interest from February 29, 1988. ($79,954.56 to December 14, 1988).

■ Regarding the underpayments, this claim is governed by Ecuadorian law, including the Ecuadorian law of pre-judgment interest. The issue for the court is whether to apply the legal rate of interest in effect at the time of the breach uniformly until the entry of judgment, or whether to "segment" the interest by changing the rate with changes in the Ecuadorian legal rate.

The defendants' expert, Dr. Miguel Andrade Varea, testified that under Ecuadorian law, the rate of pre-judgment interest is fixed at the time of the breach of contract. In support of his opinion, Dr. Andrade relied on Article 8 of Monetary Board Resolution No. 755, Official Register 728 (Jan. 13, 1975), and subsequent Resolutions. (DTX 439.) Article 8 provides:

The provisions of this Regulation [setting legal interest rates] shall be applicable only to acts and contracts entered into from the date of its publication in the Official Gazette. Therefore, the interest rates set forth in acts and contracts entered into prior to that date, whether or not due, will continue to be in effect until expiration of the term agreed in the respective act or contract.

Dr. Andrade testified that the "acts" referred to include interest-triggering events, such as a default under a contract or filing a lawsuit. Thus, under his theory, a change in the legal rate of interest would not affect a prior breach of contract; the interest calculation would remain fixed at the rate in effect at the time this lawsuit was filed.

The companies also cite an Ecuadorian case for the proposition that Ecuadorian courts construe Article 8 to mean that interest rates for contract claims are fixed on the date of filing the lawsuit. *Segovia v. Acosta,* Judgment No. 341, Third Chamber, November 11, 1977.

The plaintiff argues that the rate of interest to be applied varies with the legal rate as established by the Monetary Board, or in other words, the rate should be segmented. In support of that position, plaintiff's presented an expert who testified that under Ecuadorian law, there is a general proposition that a more recent law supercedes an earlier one. (Tr. 624.) Plaintiff also argues that each Monetary Board Resolution "derogates" or supercedes the prior ones, and therefore replaces the interest rate established in prior regulations even for prior existing debts. *See* Resolution 755, Article 9.

The court finds that the interest should be segmented for several reasons. First, the Ecuadorian law regarding segmentation, as presented at trial, is unclear. The Regulation speaks to "acts and contracts entered into from the date" of publication of the Regulation. This language does not clearly reach such occurrences as a breach of contract or filing a lawsuit. Rather, the following sentence speaks of "acts and contracts entered into prior to [the date of

publication], whether or not due, will continue to be in effect until expiration of the term agreed in the respective act or contract." Resolution 755, Art. 8. This sentence seems to indicate that a change in the legal interest rate will not affect any agreed upon interest rates established by agreement before the change in the legal rate. Thus, the court concludes, the Resolution is ambiguous as regards its effect on pre-judgment interest for breaches of contract.

Second, the court finds that the case of *Segovia v. Acosta* is not persuasive on the issue of segmentation. It is well established that in civil law jurisdictions, little or no precedential effect is given to judicial decisions. Further, the difference in *Segovia* in segmenting or not segmenting resulted in a minimal amount of money. The *Segovia* court does not give any authority for its decision beyond a quote from the monetary board Resolution. Therefore, this court finds that the *Segovia* case does not establish that interest is not segmented under Ecuadorian law.

Third, the issue of segmentation arises in connection with a claim for damages. The purpose of awarding interest on damages incurred is to make whole the party owed those damages by compensating him for the loss of the use of his money for the period involved. This purpose would be thwarted by not changing the interest rate to reflect changes in the use-value of money over time. Further, not segmenting interest places the decision as to whether or not to pay the money due on the obligor. Should interest rates rise, the obligor's incentive is not to pay the debt for as long as possible, since when he does pay, he will pay interest at a rate less than he is able to earn on the money while he holds it. Should interest rates fall, then the obligor's incentive is to pay immediately. Regardless of the direction of the change, the decision remains with the obligor. The better policy clearly seems to be to segment interest rates according to the legal rate variously applicable during the period in question. The court concludes that if an Ecuadorian court were faced with the issue facing this court, where the interest-triggering event occurred some fourteen years before judgment, and the interest rates rose from 8% to, at one point, 23%, the Ecuadorian court would conclude that the proper result under Ecuadorian law would be to segment interest.

Having determined that the interest should be segmented, the court finds, (counsel having agreed on the mathmatics of this point) that Norsul's damages for the underpayments of royalties total: $1,056,-383.44, plus daily interest of $231.15 from February 29, 1988 ($66,571.20 to December 14, 1988).

### Claims for Future Losses

Plaintiff claims for future losses of royalties on Shushufindi No. 1 production. The Court finds that an award for future losses is inappropriate, since it will be assumed that Texaco will include Shushufindi production, to the extent of its 37.5 per cent obligation, in future accountings and payments. Therefore, plaintiff's damages on this claim are limited to payments due and unpaid as of the date of judgment. Should the judgment be superseded on appeal, or for other reasons future royalty payments fail to include Shushufindi production, plaintiff may seek modification of the judgment when it becomes enforceable.

### Enforceability of Judgment

The Court concludes that the judgment should be enforced in all respects as other judgments entered by the Court. Defendants have asked that the judgment be paid to the Central Bank of Ecuador, asserting that the government may construe any judgment recovered by plaintiff as subject to the 86 per cent tax imposed by Supreme Decree 602, and if it is collected in the United States defendants might be subject to liability as withholding agents.

As to the 1973–1974 underpayments, no additional payments of tax could be claimed, since the entire tax on those payments has already been paid, based on Tax Reference Price and without the deductions taken by defendants in the payment of plaintiff's after-tax 14 per cent.

The Court expresses no opinion whether the Ecuadorian government may assert any tax interest in plaintiff's recovery on the Shushufindi claim. However, the Court notes that Gulf, to the extent of its potential obligation for 1976 payments, has been exonerated from liability as withholding agent or otherwise, and that both defendants have secured a decision of the Tax Court of Ecuador absolving them of tax liability thereon and awarding a refund of taxes paid between 1972 and 1975. There is further question, which the Court need not resolve, whether Texaco Petroleum Co. would have any liability as withholding agent in the case of a judgment collected from Texaco, Inc. At all events, the Court assumes that whatever tax interest may be asserted on this recovery by any jurisdiction will be asserted and dealt with in the normal course of law, whose reach in such matters is outside the scope of the Court's inquiry.

In view of the above, the plaintiff, Norsul, is entitled to judgment against the parties as follows: as against Gulf and Texaco and subsidiaries, jointly and severally, in connection with the three quarters underpayments claim $1,122,954.64. As to the Shushufindi payment due, total damages are assessed in the amount of $1,797,-926.92. Defendant Gulf is jointly and severally responsible for a part of that amount represented by its obligations to December 31, 1976 (when it entered into the transfer agreement with the Ecuadorian Government).

A separate judgment will be entered in accordance with this memorandum opinion.

DONE AND ORDERED.